AMALGAMATED MEAT CUTTERS
AND BUTCHER WORKMEN OF
NORTH AMERICA, AFL–CIO et al.,
Plaintiffs-Appellants,

v.

The COST OF LIVING COUNCIL as successor to the Pay Board et al.,
Defendants-Appellees.

No. DC–19.

Temporary Emergency Court of Appeals.

May 15, 1974.

Laurence Gold, Washington, D. C. (Mark P. Muller, Philadelphia, Pa., on the brief), for plaintiffs-appellants.

John N. Hanson, Dept. of Justice, Washington, D. C. (Irving Jaffe, Acting Asst. Atty. Gen., William E. Nelson, and Stanley D. Rose, Dept. of Justice, Washington, D. C., on the brief), for defendants-appellees.

Before HASTIE, ANDERSON and HASTINGS, Judges.

ANDERSON, Judge:

On March 1, 1971, a collective bargaining agreement was entered into by the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, and its Joint Council of Philadelphia and vicinity Local Unions Nos. 56, 197, 198 and 199 (the Unions), and Acme Markets Inc., the Great Atlantic and Pacific Tea Co. Inc., and Food Fair Stores, Inc. (the Employers). Among other provisions, the agreement contained a deferred wage increase of approximately 11%, effective March 4 and 5, 1972, for certain meat-cutting employees. It also granted to the Employers the right to buy and sell "block ready meats," that is, certain cuts prepared outside the Employers' premises and theretofore prohibited by the Unions because the "prefabricated" cuts required less man-hours of union labor at the Employers' stores. On March 27, 1972, the Pay Board (the Board), predecessor to the Cost of Living Council (CLC), pursuant to its authority under § 203(c)(1) [1] of the Economic Stabiliza-

---

1. Subsection (1) of § 203(c) reads as follows:

"The authority conferred on the President by this section shall not be exercised to limit the level of any wage or salary (including any insurance or other fringe benefit offered in connection with an employment contract) scheduled to take effect after November 13, 1971, to a level below that which has been agreed to in a contract which (A) related to such wage or salary, and (B) was executed prior to August 15, 1971, unless the President determines that the increase provided in such contract is unreasonably inconsistent with the standards for wage and salary increases published under subsection (b).

Section 203(b) provides:

"In carrying out the authority vested in him by subsection (a), the President shall issue standards to serve as a guide for determining levels of wages, salaries, prices, rents, interest rates, corporate dividends, and similar transfers which are consistent with the purposes of this title and orderly economic growth. Such standards shall—
(1) be generally fair and equitable;
(2) provide for the making of such general exceptions and variations as are necessary to foster orderly economic growth and to prevent gross inequities, hardships, serious market disruptions, domestic shortages of raw materials, localized shortages of labor, and windfall profits;
(3) take into account changes in productivity and the cost of living, as well as such other factors consistent with the purposes of this title as are appropriate;
(4) provide for the requiring of appropriate reductions in prices and rents whenever warranted after consideration of lower costs, labor shortages, and other pertinent factors; and
(5) call for generally comparable sacrifices by business and labor as well as other segments of the economy."

1362

tion Act (the Act), challenged the legality of the deferred wage increase.

In the ensuing proceedings before the Board, the Unions asserted that the wage increase was primarily justified by the increase in productivity brought about by the change in the work rules relating to the Employers' use of the "block ready meats."

Upon learning of the challenge to the agreement, the Unions sought from the Employers certain data relative to employment and to the output of meat department employees, but they received no answer. On May 24, 1972, the Board held a hearing at which the Unions and the Employers were present and were heard. The Unions claimed they were entitled to the full 11% wage increase because the gain in productivity from the use of "block ready meat" justified it. The Unions requested the Board to compel the Employers to disclose the relevant employment and production data. The Employers, however, claimed that much of this data was confidential within the terms of § 205 of the Act. The Board offered to hear a formal application for disclosure under the Freedom of Information Act but this offer was declined by the Unions.

Both the Unions and the Employers submitted evidentiary materials to the Board. The Board received information about the dates and amounts of recent wage increases from official forms filled out and returned to it by the three employers. The Board also learned from the Employers on April 26, 1972 that the wage increases for the groups involved here totaled in excess of 60% for the six year period from February, 1966 to March, 1972 and stated that the units in question presently enjoyed wage rates "among the highest . . . in the supermarket industry." On May 23, 1972, the Employers also submitted the portions of the relevant collective bargaining agreements dealing with the new work rule and job guarantee provisions. On May 26, the Employers filed the confidential submission referred to above.

Significant evidentiary material was presented to the Board by the Unions on May 23 and May 26, 1972, in which they admitted that "[a]verage hourly earnings in Philadelphia meat departments are not low," but, on the contrary, compared "well" with those nationally, although they maintained that the wages were low contrasted with those in other jobs calling for similar skill. The material also indicated that the "prefabricated meat" issue had been "central to all Union-Management negotiations in the retail meat industry for the past 15 years," and "hard fought" all the way. This implied, too, that the operation of the new rule would result in substantial productivity benefits for management. The Unions, in the form of a letter dated May 26, 1972, submitted to the Board additional material containing confirming data which showed wage increases exceeding 60% over the six year period ending in 1972, and figures showing that in the period 1968 through 1972, the February to March increase in the Philadelphia Consumer Price Index component for meat, poultry and fish exceeded the national increase in four of the five years. As to productivity, the evidentiary material disclosed a generally "high estimate" of meat cost savings from the use of "prefabricated meats," but the Unions conceded such savings were not being fully realized by the Philadelphia employers. On the basis of these estimates, the Unions claimed that "the substantial wage increases" involved here "would . . . appear to be not inconsistent with actual unit cost reductions."

On June 13, 1972 the Board issued an order prospectively disapproving the wage increase to the extent that it exceeded 7%. With regard to the employment and production data sought by the Unions from the Employers but claimed by them to be confidential under § 205 of the Act, the Board withheld it from the record on the ground that it was irrelevant, in the sense of being immaterial to the issues in the case. The district

court was of the opinion that it should have been disclosed to the Unions. Although this matter was argued by the appellants-Unions on appeal, the data was apparently never made a part of the record and is not before us.

The Board in its opinion went on to give the bases of its decision as follows:

"5. That, on the basis of the other evidence submitted by the parties including facts relating to the relatively high current level of wages in the employee units involved, the frequency and amount of wage and salary increases in the employee units involved during the previous four years, and the job guarantee provisions contained in the contract, the increase in wages and salaries for the second control year in each of the employee units involved is in excess of the general wage and salary standard of 5.5% and in excess of the maximum permissible annual aggregate increase (7%) permitted for exception pursuant to Sections 201.11(a) and (b) and should be disapproved as unreasonably inconsistent with the criteria established by the Pay Board.

6. That, upon the other evidence submitted by the parties including the fact that employees in the employee units involved have been receiving the full amount of the negotiated increases for approximately three months, the circumstances are such that the following adjustment in wages and salaries in each of the employee units involved would not be unreasonably inconsistent with the criteria established by the Board: A 7% increase in wages and salaries, computed in accordance with Pay Board policy and regulations."

The decision then noted that the situation of the employees was such that they should be permitted to retain the excess wages, i.e. the amounts over the approved 7% increase, which they had been receiving for the past three months, without the necessity of making restitution for this excess amount; and that they would thereafter receive wages, fixed to conform to the permissible increase of 7%, at the next pay period following the date of the decision.

In September, 1972 the Unions filed with the Board a motion to reopen and reconsider the decision; and, on October 13, 1972, the Board denied the motion on the ground that the Unions had presented "no new evidence for Board consideration." The Board, in a portion of its opinion, explained its treatment of the productivity factor as follows:

"3. That the productivity increases alleged by the Meat Cutters Union were previously considered by the Board and, assuming such allegations would be adequately demonstrated by the evidence, were determined to be insufficient to warrant approval of an increase in wages and salaries in excess of 7%."

In other words the Board, in effect, said that if it assumed that all of the facts alleged and claimed by the Unions were true and that there was a sufficient increase in productivity, absent any other considerations, to warrant an 11% escalation in wages, still the Board, in the light of the other factors required by § 203, which it must take into consideration, could not and would not approve of a wage increase for the meat cutters, in excess of 7%.

The Unions on January 10, 1973 commenced this action in the United States District Court for the District of Columbia seeking a declaratory judgment and an injunction against the Board. The parties stipulated the facts and filed cross-motions for summary judgment. After hearing arguments from the parties the district court, on November 5, 1973, entered judgment in favor of the Cost of Living Council (CLC), which had succeeded the Pay Board on March 6, 1973.

The Unions have appealed to this court, claiming the trial court erred in (1) holding that, while the Board should have ordered the Employers to disclose to the Unions the productivity data which the Employers withheld as confi-

dential, the error was harmless and (2) in failing to give to the factor of productivity, within the meaning of § 203 (b)(3), sufficiently full consideration to justify an increase in pay of 11%. We affirm the judgment of the district court.

The question of the disclosure to the Unions of productivity information in the hands of the Employers which they refused to put into evidence because in their view it was confidential matter within the meaning of § 205, comes to this court as a somewhat academic issue. The Board apparently looked at the material but held it to be "irrelevant." The district court held in effect that it was relevant in the ordinary sense of the word, and concluded that it should have been disclosed to the Unions. The record, however, reveals no consideration of the terms of § 205, whether plaintiff's counsel was a proper recipient of the confidential information and if so what safeguards, if any, should be imposed. The exact nature of the material is unclear; the trial judge never examined it in camera, nor did either of the parties ever move to have the material marked and sealed as a part of the record of the case for review by this court. The district court stated only that "it was error not to make known to the employees the data" on productivity but went on to declare that it was no more than harmless error. While in this state of the record we would normally remand the case for further development of this issue and, while we cannot accept as correct the court's conclusion of law that the Board committed error in refusing disclosure without knowing more of the circumstances, we do agree that if there was error, it did not affect the decision.

The reason for this is that on this summary judgment action the Board and the CLC have, for the purposes of the case, assumed throughout that the Unions' allegation and claim that there was sufficient increase in productivity, as one of the five factors to be considered under § 203(b), and, assuming the remaining four factors remained fairly constant, to warrant a roughly proportionate increase in wages, in this case 11%, were correct.

The Board's adoption of the Unions' own claim of 11% increase in production as supporting a like percentage level of increased wages was plainly intended by the Board to be regarded as an outside figure, giving to the Unions the benefit of all doubt as to the size of any increase in production.

■ In other words because the Board accepted the productivity claims of the Unions and did not use the confidential submission of the Employers in reaching its result, it is unnecessary to decide whether the failure to divulge the information was erroneous; but even if it were, it was harmless.

Moreover, the productivity increase claim is based solely on the modification of the work rules to permit the Employers to buy and sell "fabricated" meats; and there is no serious dispute that the three Employers did not fully take advantage of this change and one of them, Acme, did not use it at all.

Proceeding on this 11% assumption, the Board took up the other factors, beside productivity, which it was bound to consider in administering § 203 of the Act and concluded that the sought-for wage increase would be in excess of the standard for permissible annual wage increases under the Stabilization Program; that the employees had received several large wage increases in the past four years; that they had been given job guarantees; that at the time the whole country was suffering from food price inflation and that the Employers, along with other food retailers, had been placed under stringent price controls, that labor and management were called upon to make comparable sacrifices in halting inflation and that these employees were not suffering from any inequity or hardship or other similar factors which would justify an increase in their wages in excess of 7%.

The Board also stated that the Employers' claimed confidential material on productivity was in the circumstances of the case, immaterial and was, therefore, not considered by the Board in making its decision.

■ The Unions argue, however, that the Board never actually considered the important factor of productivity at all and that it was because of the Board's refusal to consider it, that the productivity material in the hands of the Employers was branded as "irrelevant". The Unions also charge that the decision of June 13, 1972 and the later decision of October 13, 1972, on the motion for reconsideration, were inconsistent and that the second opinion was issued in bad faith in an effort to bolster up the deficiencies in the first opinion which did not expressly deal with productivity. We are satisfied, however, that there was no bad faith on the part of the Board or the CLC, that the decisions should be read together and that it is certain the Board gave full and serious consideration to the factor of productivity. It dealt with it in the light most favorable to the Unions. In their own evidentiary material, the Unions had given a "high estimate" of meat cost savings from the change in the work rule on which its productivity claim is based, and strongly implied that these percentage savings would be on the same order of magnitude as the percentage wage increase sought.[2]

■ The Unions also contend that the Board could not have given them any credit for a productivity increase because they were only given a 7% raise, a level "considered *per se* 'reasonably consistent' with the Pay Board's 5.5% overall guideline, . . . [without any] justifi[cation] at all." Actually the Board awarded greater than a 7% increase here. The period of the increase under the collective bargaining agreement began on March 4 and 5, 1972, and ended on March 3, 1973. The Board's decision of June 13, 1972 was expressly limited to begin with the next following pay period; the equitable position of the employees was held not to require restitution of the excess above 7% already received. Thus the employees enjoyed the full 11% for at least three of the twelve months of the increase. Even without taking into account the additional benefit of present value of the earlier received increase, the Board in effect allowed an increase of 11% for one-quarter of the year, and 7% for the remaining three-quarters, or an average of 8% for the year. Even if only 7% had been given, this percentage, although sometimes granted, was not adopted universally or automatically.

■ There was still discretion in the Board to give less for deferred wage increases. See Pay Board Release 38, January 13, 1972. The Board's position that the appropriate yardstick was the 5.5% annual wage standard imposed on most of the economy, accords with the command of § 203(c)(1) that the deferred wage increase be allowed unless it is determined to be "unreasonably inconsistent with the standards for wage and salary increases published under subsection (b)", i.e., the 5.5% figure, which itself incorporates a 3% annual productivity increase along with a 2½% rate of tolerable inflation. In short, the Board was permitted under the Act to find an additional 1½% of increase allowable here, and its judgment, following a consideration of the surrounding economic circumstances, was reached through a proper exercise of its administrative expertise.

■ While the Unions give limited recognition to the Board's duty to consider all of the factors set out in § 203

---

2. In replying to the district judge's observation, during the arguments, that the productivity increase expected could not have exceeded 11%, the Unions' counsel said, "Well, I would say simply the Union would have struck a bad bargain if the productivity increases alone would have hurt their members more than the wage increase that was secured."

in determining whether a wage increase is reasonably consistent with national wage standards, they appear to regard the matter of increased productivity as of almost controlling importance and look upon the other factors mentioned in § 203 as of considerably lesser weight. It is the function of the Board (now CLC) to weigh and balance all of the pertinent economic factors, and we are satisfied it did so in this case. It found that several factors, particularly the high wages already being paid the employees and the rapidly rising inflationary pressures affecting food prices and the controls placed on this section of the economy, obliged the Board to hold that the 11% increase in wages was unreasonably inconsistent with the national wage standards.

■■ This case is governed by our decision in Plumbers Local Union No. 519 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO v. Construction Industry Stabilization Committee, 479 F.2d 1052 (Em.App.1973). The Unions say that *Plumbers* is distinguishable because it concerned action by the Construction Industry Stabilization Committee (CISC) rather than by the Pay Board or CLC. But this is a distinction without a difference because the provisions of the Act apply similarly to both bodies, and the CISC was authorized to administer the Board's policies in the construction industry. Pay Board Release #45 January 28, 1972. The Unions also point out that *Plumbers* arose under § 203(c)(3), whereas the present case concerns § 203(c)(1) that, while the burden of proof rested on the plumbers local in the former, in the present case the burden rests on the Government. This statement is correct, but it is of no significance in this summary judgment action in which, for the purposes of the case, the Unions' claim as to productivity was assumed to be the fact; and the Government had ample evidence to support the Board's conclusion that the whole wage increase claimed was not "consistent with the purposes of [the Act] and orderly economic growth." There was no issue of burden of proof.

■ What was said concerning the CISC in *Plumbers* applies in this case to the Pay Board and the Cost of Living Council:

"This type of judgment, involving the balancing of interrelated economic factors, is peculiarly within the scope of the expertise with which . . . [CLC] is presumptively endowed. This court has repeatedly held that great deference should be given to the expertise of the economic stabilization agencies. See United States v. Lieb, 462 F.2d 1161 (Em.App.1972); University of Southern California v. Cost of Living Council, 472 F.2d 1065 (Em.App.1972)." 479 F.2d at 1056.

The judgment of the district court is affirmed.