GETTY OIL COMPANY, Plaintiff,

v.

DEPARTMENT OF ENERGY, et al., Defendants,

and

United States of America, Counterclaimant.

Civ. A. No. 77–434.

United States District Court, D. Delaware.

July 7, 1983.

---

Charles F. Richards, Jr., Richards, Layton & Finger, Wilmington, Del., William Simon, William E. Wickens, Frederick S. Frei, Joanne Parsons Underhill, Howrey & Simon, Washington, D.C., C. Lansing Hays, Jr., David A. Ross, Dechert, Price & Rhoads, New York City, R. David Copley, Jr., Robert Hafey, Getty Oil Company, Los Angeles, Cal., for plaintiff.

Joseph J. Farnan, Jr., U.S. Atty., Wilmington, Del., Nancy C. Crisman, Larry P. Ellsworth, David A. Engels, Mark Kreitman, O. Ann Horn, Barry Sheingold, Dept. of Energy, Washington, D.C., for Federal defendants.

## OPINION

STAPLETON, District Judge:

Plaintiff Getty Oil Company ("Getty") seeks this Court's review of a decision of the Department of Energy ("DOE") Office of Hearings and Appeals ("OHA") issued October 7, 1977 ("the October 7th Decision"), which found Getty had overcharged Standard Oil Company of Ohio ("Sohio") more than $84 million for price-controlled domestic crude oil. The United States counterclaims for that amount, plus approximately $27 million in additional overcharges stemming from the transactions addressed in the October 7th Decision. The case is currently before this Court on cross-motions for summary judgment.

## I. BACKGROUND.

### A. *The Transactions*

In July 1971, Getty and Sohio entered into an agreement in which Getty agreed to sell Sohio 25 thousand barrels per day of domestic crude, which at Getty's request was expressly contingent on sale of an equal volume of foreign crude to Getty by British Petroleum Company, Ltd. ("BP"). A.R. 589. Getty's contract for sale of domestic crude to Sohio was for the period January 1972 through December 1973, and from year to year thereafter unless terminated by either party. A.R. 53. BP's agreement to sell foreign crude to Getty, through its European subsidiary, BP Trad-

ing, Ltd., was for the identical term. A.R. 60. The domestic and foreign volumes to be exchanged pursuant to these agreements were to be equivalent:

> Should either agreement be terminated as to all or a portion of the crude oil covered by the respective agreements, then the other agreement shall be terminated as to a similar quantity of oil.

A.R. 589. Pursuant to these agreements, Getty in fact transferred approximately 25 thousand barrels per day of domestic crude to Sohio and BP transferred to Getty approximately 25 thousand barrels per day of foreign crude. A.R. 298, 783, 784. Reciprocal cancellations of the 1971 agreements were to take effect on January 1, 1974. A.R. 591, 595.

During 1973, Getty and Sohio negotiated an extension of the existing 1971 reciprocal domestic and foreign agreements, with Sohio proposing to assume BP's rights and responsibilities under the foreign agreement. On May 2, 1973, three Getty representatives and three Sohio officials met in Houston to discuss the details of a three-year extension of both 1971 agreements. A.R. 131. At that meeting the parties reached tentative agreement on the principles of extension of both the foreign and domestic transactions. A.R. 131–134. It was decided to execute two new contracts to reflect the terms agreed upon. *Id.* A Getty memorandum of the May 2nd meeting refers to the "crude oil exchange agreements" and to the "tentative agreement" reached. *Id.* Immediately after the May 2nd meeting, Jack Brandon of Getty prepared a single outline covering the terms of "the tentative agreement." A.R. 132. This "Outline of Basic Principles of Proposed Agreement" covered both the foreign and domestic transactions as if they were one agreement. *Id.* Only after this agreement was reached did the parties draft two separate contracts. The contracts were drafted on the basis of this outline. A.R. 131.

Both contracts were dated and executed May 16, 1973. A.R. 119, 612, 629. The contract for sale of foreign crude by Sohio

to Getty ("the foreign agreement") specifies a term from January 1, 1974 to January 1, 1977, and year-to-year thereafter unless twelve months' notice of termination is given. A.R. 612. The contract for sale of domestic crude by Getty to Sohio ("the domestic agreement") identically provides for a three-year extension of the existing 1971 domestic agreement, from January 1, 1974 to January 1, 1977 and year-to-year thereafter, with twelve months' notice of termination. A.R. 629, 632.

The terms of the two contracts are interdependent. The price of foreign crude to be delivered to Getty under the foreign agreement is equal to the price set in the domestic agreement less a per barrel differential:

> Buyer [Getty] shall pay to Seller [Sohio] for the quantities of each shipment a price per barrel f.o.b. loading terminal equal to the price per barrel paid by Seller to Buyer for oil purchased by Seller during the month in which said shipment commences loading, under that certain crude oil purchase agreement of July 30, 1971, as revised, amended and extended by an agreement executed as of May 16, 1973 (said "May 16, 1973 agreement") executed by the parties hereto concurrently herewith, less a differential of $1.770 per barrel for Iranian Light Export Oil and less a differential of $1.562 per barrel for Abu Dhabi (Land) Export-Murban crude petroleum.[1]

A.R. 614. The price for foreign oil can not be determined independently under the foreign agreement, but only by specific reference to the domestic agreement.

Paragraph 6 of the foreign agreement provides for price adjustments, also linked to the domestic agreement. Should either party allege that the price of foreign crude was "more or less than its value relative to the price under the [domestic agreement]," it could seek a price adjustment. A.R. 617.

Should Sohio seek such adjustment and Getty refuse, the foreign agreement allows Sohio the option to cancel the foreign agreement, but concurrently provides Getty the option to cancel the domestic agreement. A.R. 616, 617 ¶ 6. If Getty should seek such an adjustment and Sohio refuse, Getty was entitled to cancel the foreign agreement, but the domestic agreement would remain intact. The domestic agreement provides that it may be terminated on less than 12 months' notice only as permitted under the provisions of the foreign agreement:

> [The domestic agreement] shall be subject to termination as provided in that certain crude Petroleum Sale Agreement dated May 16, 1973, between the parties hereto, executed concurrently herewith, relating to the purcase by Getty Oil from Sohio of Iranian Light Export and Abu Dhabi (Land) Export-Murban crude oil.

A.R. 630.

The foreign agreement requires that "balancing quantities" be delivered under both the foreign and domestic agreements. The foreign agreement states: "It is the intent of each party to receive the volumes of crude petroleum specified hereunder and under said May 16, 1973, [domestic] agreement." A.R. 615 ¶ 5. The agreements provide that, should deliveries by Sohio be short because of *force majeure*, Getty may require Sohio to make up the shortfall after expiration of the foreign agreement by delivery of domestic crude of the same grades delivered by Getty under the domestic agreement, and priced pursuant to the provisions of the domestic agreement. A.R. 615, 616 ¶ 5.

Beginning in September 1973, the petroleum price control regulations, initially

---

1. At the time Getty and Sohio entered the May 1973 transaction, no price controls governed first sales of domestic crude oil at the producer level. A.R. 1330. The spiral of OPEC price increases had not begun, and market price for similar grades of crude, foreign and domestic, was roughly comparable, adjusted for location. In fact, the prevailing price of foreign crude at the locations where Getty was to take delivery from Sohio was *less* than the posted price of domestic crude where Sohio took delivery from Getty. A.R. 1331. Accordingly, the contracts provided a per-barrel differential ($1.77 for Iranian light, $1.562 for Murban) to compensate for the then prevailing higher price of domestic crude. A.R. 303.

adopted by the Cost of Living Council in August 1973 (6 C.F.R. § 150 Subpart L), and subsequently adopted in January 1974 by DOE's predecessor agency, the Federal Energy Office ("the FEA") (10 C.F.R. Part 212, Subpart D), established a maximum ceiling price for domestic crude oil equal to applicable May 15, 1973 posted price levels, plus certain allowable increases.[2] In October 1973, OPEC increased its crude prices by approximately 70%. By January 1974, the world market price for foreign crude was generally four times greater than it had been one year earlier. A.R. 1331. As a result, the value of foreign crude Getty received from Sohio increased dramatically.

When the bargain was struck by Getty and Sohio in 1973, each firm had contemplated receiving crude oil at generally prevailing market prices. A.R. 1199. When the price of foreign crude spiralled upward, Sohio sought no adjustment, apparently being willing to accept price controlled domestic crude for its market priced foreign crude because the price regulations permitted a refiner to account for the cost of its crude oil as a product cost, and pass on that cost to purchasers of its refined products. 6 C.F.R. §§ 150.355(g), 150.356(b); 10 C.F.R. §§ 212.82(f), 212.83(b). OHA found that Sohio measured the cost of the domestic crude it received from Getty by the market value of the foreign crude which it delivered to Getty and passed through to its customers as product cost an amount equal to the difference between the value of the foreign crude Sohio gave up and the domestic crude Sohio received. Getty claims it was wrongfully deprived of discovery regarding Sohio's treatment of its dealings with Getty and does not concede that Sohio treated the difference between the value of the oils delivered as a part of its cost. With this exception, however, the facts thus far recited are undisputed.

B. *The Administrative Proceedings*

DOE initially took the position, in a Notice of Probable Violation ("NOPV") issued to Sohio in 1974, that Sohio's pass-through of the value of the foreign crude it transferred to Getty was unlawful because, it was thought, Sohio's cost was solely the cash amount Sohio paid to Getty for Getty's domestic crude. A.R. 1–3. Following the issuance of that NOPV, the agency reconsidered its position and determined that Sohio's true product cost included the value of the foreign oil which Sohio gave up. Three weeks after its issuance, the NOPV to Sohio was withdrawn. A.R. 6.

In August 1975, DOE issued an NOPV to Getty which alleged that the agency:

> has reason to believe that the transfer of old oil by Getty in return for higher-valued foreign oil between October 1973 and the current time, constitutes the charging of a price by Getty in excess of the ceiling price, in violation of 10 C.F.R. § 212.-73 since January 15, 1974, and 6 C.F.R. § 150.354, between October 1973 and January 15, 1974.

A.R. 11. The NOPV also charged a violation of the Entitlements Program, 10 C.F.R. § 211.67.

After consideration of Getty's response to the NOPV, DOE issued a Remedial Order ("RO") to Getty in August 1976. A.R. 178. Getty filed an appeal with OHA in October. A.R. 277. Sohio submitted extensive comments at the appeal stage, A.R. 579, and the Air Transport Association of America ("ATA") intervened in support of the Remedial Order. A.R. 693, 817. A hearing was conducted in March 1977. A.R. 855. On October 7, 1977, OHA's Decision and Order issued, affirming the finding of Getty's violation. A.R. 1295. The October 7th Decision rescinded the allegation of an entitlements violation, concluding instead that Getty was liable for a crude oil ceiling price violation during the period October 1973 through January 1976. The Decision further concluded that refund through Sohio to directly affected purchasers was not feasible, and ordered Getty to remit the overcharges to the United States Treasury.

---

**2.** These regulations remained effective in substantially the same form until January 28, 1981, the date of decontrol of petroleum prices.

## II. THE "PRICE" ISSUE.

### A. *The 1973 Agreements*

The regulation governing maximum prices for crude sales by producers is 10 C.F.R. § 212.73. During the period relevant to this case, it read:

(a) *Rule.* Except as provided in section 212.74, no producer may charge a price higher than the ceiling price for the first sale of domestic crude oil.

\* \* \* \* \* \*

(b) *Ceiling price determination.* The ceiling price of a particular grade of crude oil in a particular field is the sum of (1) the highest posted price at 6 a.m., local time May 15, 1973, for that grade of crude oil at that field, or if there are no posted prices in that field, the related price for that grade of domestic crude oil which is most similar in kind and quality at the nearest field for which prices are posted; and (2) a maximum of $1.35 per barrel.

The regulations define "price" as follows: "Price" means any consideration for the sale of any property or services and includes commissions, dues, fees, margins, rates, charges, tariffs, fares, or premiums, regardless of form.

10 C.F.R. § 212.31.

■ The threshold issue in this case is whether the DOE was acting within its authority when it treated the domestic and foreign agreements as a single economic transaction or whether those agreements must be regarded as "separate and distinct purchases and sales of crude oil", as contended by Getty. (Complaint ¶ 42(a)). Taking the former approach, the DOE concluded that the value of the foreign oil received by Getty was properly considered part of the consideration received for the domestic oil. If the latter approach is required, however, the price received for Getty's domestic oil would be limited to the cash payment under the domestic agreement. I conclude that the DOE was authorized to treat the 1973 domestic and foreign agreements as an integrated transaction and to conclude that the value of the for-

eign oil constituted part of the consideration for Getty's domestic oil. Based on the existing administrative record, I reach a contrary conclusion with respect to the domestic and foreign agreements entered into in 1971.

■ A regulatory agency is not bound by the form that regulated parties have chosen for a particular transaction. It may look through the form to the economic substance of the transaction whenever the regulatory purposes of Congress will be served by doing so. *E.g., Mobil Oil Corp. v. FPC,* 463 F.2d 256, 259 (D.C.Cir.1971), *cert. denied* 406 U.S. 976, 92 S.Ct. 2413, 32 L.Ed.2d 676 (1972). As noted in *Tenneco v. FEA,* 613 F.2d 298, 302 (TECA 1979), "where a transaction is in substance and economic effect a sale [within the meaning of the DOE regulations, neither the agency nor a reviewing court is] . . . bound to follow the labels chosen by the contracting parties." Moreover, while there are limits on how far an agency may stray from the "plain meaning" of undefined regulatory terminology, those limits are not exceeded when the agency's construction of its regulations is a rational one when considered in light of the regulatory text and the Congressional purpose. The "plain meaning" rule of construction is thus not a linguistic straightjacket, but rather a safeguard against exotic interpretations which have the effect of depriving those regulated of a fair opportunity to conform their conduct to the law. *Id.*

The agency concluded in this case that in substance and effect the 1973 domestic and foreign agreements were one transaction and that Getty had bargained for Sohio to deliver the foreign oil in exchange for its promise to deliver the domestic oil. There is ample support for these conclusions. As the above recitation of the undisputed facts indicates, the contracts executed by Getty and Sohio in May 1973 were interdependent. They were coextensive in duration, expressly related to each other in respect to price, volume, term and termination, negotiated at the same meeting and executed on the same date. Moreover, there is no suggestion that either party would have been

willing to enter one of the contracts without simultaneously entering into the other.[3] Indeed, the only inference which can rationally be drawn from the contracts themselves is that one contract would not have been executed without the other.

The purpose of the price control program was to limit the economic value that could be received by a seller of domestic oil. In this context, it is hardly surprising that the DOE views the value bargained for and received under one reciprocal contract as part of the consideration for the domestic oil supplied under the other. Indeed, as the agency decision noted, the effectiveness of the price control program would be put in jeopardy if a party could exclude from the "price" received for controlled crude a portion of the bargained for consideration through the simple expedient of executing two reciprocal contracts.

Getty stresses that the 1973 agreements were entered into prior to the inauguration of the price control program and the parties, accordingly, could not have intended to evade that program. It also points out that the terms of the two agreements differ in several respects.[4] The absence of an intent to evade and the existence of some differing contract terms are not significant, however, if the *effect* of the arrangement in the price controlled market place was to allow Getty to exclude from the "price" for its domestic oil part of the consideration which it bargained for.

Getty also argues that the agency has violated the rule that terms not otherwise defined in its regulation must be given their "common law" or "plain meaning." *See*

e.g., *Tenneco Oil Co. v. FEA,* 613 F.2d 298 (TECA 1979). In particular, it urges that the DOE has ignored the plain and common law meaning of the word "consideration." Sohio's foreign crude fits comfortably within the common law concept of consideration, however, if the two contracts are properly viewed as constituting one bargain for regulatory purposes. Moreover, even if the DOE's view were not precisely coterminous with the common law concept of consideration, given the purpose of the price control program, regulated entities should certainly have anticipated the possibility that the agency would take such a view. Since I agree with the agency that the 1973 agreements may properly be considered as a single bargain, I cannot fault the agency's conclusion that the consideration that Sohio paid for Getty's price controlled domestic crude was the foreign crude which it transferred to Getty plus the net cash differential received by Getty under the terms of the agreement.

Getty also urges that the DOE single agreement approach is an arbitrary one because it fails to take into account the fact that the parties concurrently negotiated and executed a third document in which Getty agreed to buy Sohio's net profits interest in the California Kern River oil field. Since Sohio's sale of that interest was contingent on Getty's extension of the 1971 domestic agreement, Getty argues that the agency must either treat each agreement separately or all three as one. Getty's logic is unpersuasive, however, because the Kern River contract, while concurrently negotiated and executed, was not otherwise interre-

---

**3.** I do not understand Getty to claim otherwise. It has, for example, characterized the interrelationship between the two 1973 agreements as "an inducement to contract." A.R. 443.

**4.** As earlier noted, the domestic agreement could survive foreign agreement under one set of circumstances which did not occur during the violation period. Payment under the domestic agreement was due within 10 days of receipt of invoice. Payment under the foreign agreement was due in 90 days. The foreign agreement provided for arbitration of disputes. There was no dispute resolution provision under the domestic agreement. The parties could

sue. The domestic agreement provided absolute exemption from liability as a result of *force majeure.* Under the foreign agreement Sohio was required to make up shortfalls of delivery resulting from *force majeure* or other causes within 12 months. If Sohio was unable to provide the "balancing" quantities within 12 months of the expiration of the foreign agreement, Getty had the option of purchasing substitute domestic crude oil in lieu thereof. The foreign agreement was governed by the law of the State of California. The domestic agreement failed to specify the governing law.

lated by its terms with the crude oil sales agreement.

Getty next argues that the 1973 domestic and foreign agreements could not be regarded as a single contract after the adoption of 10 C.F.R. § 211.63 on January 15, 1974. According to Getty, this regulation had the effect of foreclosing it from exercising its option to terminate the domestic agreement in the event Sohio terminated the foreign agreement. Thus, Getty argues that after January 15, 1974, the continuation of the domestic agreement was not tied to the continuation of the foreign one. While this argument is creative, it is unpersuasive upon analysis.

Finally, Getty contends that the OHA decision and order are inconsistent with *Shell Oil Company v. FEA,* 527 F.2d 1243 (TECA 1975). Shell there successfully attacked the validity of DOE regulations which purported to regulate service station rents as an adjunct to petroleum price regulation. The court stressed that the regulation purported to regulate service station rents across the board including rents charged by lessees who did not supply petroleum products to their lessors. It noted that the case was therefore different from one in which the DOE believed that a lease was being used by a refiner as a way of obtaining more than a ceiling price for petroleum product supplied to the tenant. In this case the DOE has not adopted a regulation purporting to regulate the selling price of foreign crude. Rather it has analyzed a particular transaction and has found that its effect is to permit Getty to receive more consideration than the ceiling price for its domestic crude. Nothing in the *Shell* case forecloses the agency from concluding that Getty has overcharged for controlled crude transferred pursuant to that transaction.

Section 211.63 provided that, with certain specified exceptions, "all supplier/purchaser relationships in effect under contracts for sales, purchases, and exchanges of domestic crude oil on December 1, 1973, shall remain in effect for the duration of this program...." Contrary to Getty's contention, this allocation provision did not "pre-empt" or "override" the agreement between Sohio and Getty during its term, legally or in practice. The purpose of Section 211.63 was to preserve supplier/purchaser relationships and it did not foreclose Sohio and Getty from continuing to perform after January 15, 1974 in accordance with the terms of their 1973 agreement, assuming that performance had otherwise been lawful. This is precisely what they did and Getty received the same consideration for its domestic oil before January 15th as after. Assuming that Section 211.63 might have altered their contractual relationships had Sohio attempted to terminate the foreign agreement, no such effort was made during the violation period. I cannot fault DOE for taking the position that Section 211.63 was not intended to legalize what would otherwise be a ceiling price violation.

### B. *The 1972 Agreements*

Getty challenges OHA's decision and order insofar as it relates to the period from October 1, 1973 to December 31, 1973 on the additional ground that the 1972 agreements in effect during that period were three party agreements. It points out that the 1972 foreign agreement was between Getty and BP Trading while the 1972 domestic agreement was between Getty and Sohio. OHA did not regard this fact as significant because it chose to regard BP Trading and Sohio as a "single firm." According to Getty, there is no support in the record for such a conclusion. I agree.

OHA's conclusion was based primarily upon the fact that BP Trading was a wholly owned subsidiary of British Petroleum and British Petroleum owned a 26% equity interest in Sohio. It noted, in addition, however, that when Getty negotiated with British Petroleum for foreign crude in July 1971, British Petroleum insisted that matching deliveries be made to Sohio.

The conclusion that British Petroleum and Sohio were a single entity during 1972 for the purpose of determining the applicable ceiling price under Subpart D is erroneous as a matter of law and is, in any event, unsupported by substantial evidence. Because the challenged order insofar as it

relates to the last three months of 1973 is based upon that conclusion, that order cannot be affirmed in its present form.

The starting point for understanding the definition of "firm" is contained in 10 C.F.R. § 212.31, which states, insofar as is relevant to the case at bar, that the DOE may treat as a firm:

(1) A parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls, (2) a parent and its consolidated entities, (3) an unconsolidated entity, or (4) any part of a firm.

39 Fed.Reg. 1924, 1950 (Jan. 15, 1974).

The DOE thus may elect to treat all entities under common control as a single firm; it may, however, choose not to do so. When the DOE has chosen a definition of firm for a particular subpart of its regulations, it has specifically set that forth in its regulations. *See, e.g.,* 10 C.F.R. §§ 212.82 (Subpart E); 212.162 (Subpart K) (1981). The agency has not elected in the context of Subpart D to treat all entities under common control as a single firm. *Inter-North, Inc. v. DOE,* 548 F.Supp. 987 (D.Del. 1982).

Moreover, even if such an election had been made, the administrative record lacks substantial evidence to support an inference that British Petroleum controlled Sohio in 1973. The sparse record on the point reveals only that British Petroleum owned a 26% equity interest in Sohio and that British Petroleum wished Getty to sell domestic oil to Sohio, a desire which is equally consistent with the existence of an equity interest but no control.[5] In reality, what the agency has done is to assume control based on British Petroleum's 26% stock interest. The agency itself has in the past recognized that this is an unsatisfactory basis for resolving an issue of corporate control. *Commonwealth Oil Refining Co.,* Interpretation No. 1977–45, 43 Fed.Reg. 1480 (Jan. 10, 1978).

## III. THE VALUE OF THE FOREIGN OIL ISSUE.

■ To measure the value of the foreign crude received by Getty, the DOE used transfer prices determined pursuant to 10 C.F.R. § 212.84. Getty maintains that the administrative record fails to demonstrate that this was an appropriate method of measuring that value and that it was denied access to sufficient data to enable it to meaningfully challenge the accuracy of the values used.

DOE and its predecessor FEA published an index of crude oil representative transfer prices in the Federal Register periodically before decontrol. *E.g.* 40 Fed.Reg. 27059 (June 26, 1975). Data underlying the representative transfer prices were derived from monthly reports of actual market prices supplied to the agency pursuant to 10 C.F.R. § 212.84(e) by every refiner importing at least 500,000 barrels of crude oil and every refiner importing crude oil from an affiliated entity. Representative transfer prices were thus derived from actual price data through calculations [set forth at 10 C.F.R. § 212.83(e) and (f)] designed to approximate actual prices which would have been charged for those crudes in arms-length transactions.

As FEA detailed in its notices of proposed rulemaking, the basic purpose underlying the establishment of the transfer price program was to provide a regulatory mechanism which could be used to attribute a reasonable value to imported crude oil purchased from a foreign affiliate of a domestic refiner that would approximate the value of the crude oil in an arms-length transaction. This was necessary because under FEA's refiner price rules, the maximum lawful price of a refined product was directly proportional to a refiner's increased crude oil costs. 10 C.F.R. § 212.82 *et seq.* Thus, without some mechanism by which to measure the reasonableness of a refiner's reported "cost" of imported crude oil purchased from an affiliate, refiners could

---

**5.** Nor can an inference of British Petroleum control be drawn from the letter of July 30, 1971, a document advanced in the briefing as

supporting such an inference, though not relied upon by the OHA.

have frustrated the anti-inflationary objectives of the EPAA by the simple expedient of having the affiliate "sell" the imported crude oil to the domestic refiner at a greatly inflated price. Accordingly, FEA determined that:

> the actual cost of covered product (i.e. crude oil) to a U.S. affiliate in a transaction with a related entity should be established at the price which would obtain *if the product had been purchased in an arms-length transaction.*

39 Fed.Reg. 32310 (September 5, 1974) (emphasis added).

Under the transfer price regulations, FEA required companies to report "all crude oil purchases and sales by any affiliate of each company." *Id.* From this data base, which was reported to FEA on its 701 forms, FEA calculated for each month and each crude oil type a "representative" and a "maximum" arms-length price. The representative price was the lowest price at or below which 50 percent (by volume) of the reported arms-length sales occurred and the maximum price was a price ten cents higher than the representative price or the lowest price at or below which 65 percent of the reported arms-length sales occurred, whichever was higher. If a refiner's reported cost of crude oil imported from a foreign affiliate exceeded the maximum arms-length price, FEA disallowed all costs in excess of the representative arms-length price. 10 C.F.R. § 212.84(d), 39 Fed.Reg. 38366 (October 21, 1974).

The FEA, which adopted the definition of representative prices, explained the rationale behind the transfer price index as follows:

> To determine the representative price, FEA has chosen a measure which takes account of all arms-length transactions reported to it regardless of their nature. The market is, of course, composed of not one but many prices, particularly when the general level of prices is changing rapidly as it has this last year. In deciding what price to choose from those reported, FEA has selected the median because it reflects the middle level of all prices in the market, and although it takes account of all transactions, the median, unlike a weighted average, is not unduly affected from month-to-month by particular transactions at either the high or low end of the pricing range or by the particular mix of transactions reported to FEA. The median also should avoid the sharp monthly fluctuations which would occur if one used simply spot or short-term prices. On the other hand, it should not result in a price excessively dependent upon those contained in long-term contracts entered into several years ago which, notwithstanding escalator provisions for increases in government take, may not reflect the full range of arms-length prices prevailing between unaffiliated entities.

39 Fed.Reg. 32310, 32311 (September 5, 1974).

Thus, contrary to Getty's allegations, DOE's transfer prices are intended to reflect the "value" of foreign crude oil generally prevailing in arms-length transactions. Consistent with this purpose, FEA excluded exchanges from the data base because the "nature of exchanges is such that a wide variety of formal prices may be attached to the exchange without affecting its substance." 39 Fed.Reg. 32310, 32312 (Sept. 5, 1974). And, although the volumes of "spot market" sales are reflected in the transfer price calculations, they merely affect the size of the data base; the prices in such sales are not weight-averaged into the actual price calculation itself.

Finally, Getty's allegation that the transfer price data base excludes transactions where the foreign crude oil is not imported into the United States is in error. In fact, the data base includes all reported arms-length sales whether or not the crude oil is imported. 39 Fed.Reg. 32310.11 (September 5, 1974).

The foregoing regulatory background of the transfer price index made it unnecessary that an affidavit be included in the administrative record of this case explaining the methodology behind it, and establishes that it was not an arbitrary and ca-

pricious measure of the value of the foreign oil. Like other indices based on compilations of market activity it provided substantial evidence of value. *See* Section 2–724 of the Uniform Commercial Code; 28 U.S.C. § 1732 and Federal Rule of Evidence 803(8). No other competing measure of value was advanced by Getty.

The DOE's decision, having elected to utilize this index, to use "maximum price" during the first twelve months of the violation period, rather than representative price, is far less understandable, however, and cannot be sustained. The explanation offered for this decision in the briefing, though not in the October 7th Decision, is that the maximum price during the period was "lower than other objective measures" and that their use resulted in Getty being treated "the same as all other companies subject to FEA's transfer price regulations." However, OHA adopted the transfer price index as the measure of value, not "other objective measures", and there must be some rational basis in the record for the use of the maximum rather than the representative price. Moreover, "all other companies subject to FEA's transfer price regulations" were being benefited by the use of the maximum price; they were not having alleged overcharges substantially augmented by its use.

During the administrative proceeding, Getty was provided with a representative sample of the computer summaries of the transfer price data[6] that were used to compute the overcharge. A.R. 1022–1105. Get-

ty asserts that there is no substantial evidence to support the transfer prices because FEA did not give it the 701 forms which underlie the transfer price summaries. Getty asserts that it had a right to the 701 forms in the administrative proceeding in order to evaluate the reliability of the representative transfer pricing data used by OHA. While I agree that Getty had a right, upon request, to the data reflected on these forms, Getty never asked for the 701 transfer pricing forms below. Instead, Getty sought only the documents relied upon by the agency in assigning transfer price values to the foreign crude oil. A.R. 265. Accordingly, DOE's Compliance Office provided Getty with the transfer pricing summaries it had relied upon with company names deleted.[7] After Getty was given transfer pricing summaries, it did not ask FEA to provide the underlying 701 forms.[8] Nor did Getty request information about the summaries from the relevant agency official, even though Getty was specifically invited to do so. A.R. 1022, 1289. Nor did Getty seek to introduce any rebuttal evidence. Getty's failure to pursue the remedies available to it below bars any claim of a denial of due process in this Court. *Amtel, Inc. v. FEA,* 536 F.2d 1378, 1382 (TECA 1976); *Bonnaffons v. DOE,* 646 F.2d 548 (TECA 1981).

It should be noted that Getty did have the opportunity to review a representative sample of the transfer pricing data during the administrative proceeding, and to com-

---

6. No computer summaries are in the record for November, 1974 to May, 1975 because the prices for those months had already been published in the Federal Register by the time OHA needed them to calculate Getty's overcharges prior to its October 7, 1977 Order. 42 Fed.Reg. 22190 (May 2, 1977). The prices for the period October 1973 to October 1974, had not been published when the R.O. was issued, so during the administrative proceeding OHA placed in the record (at Getty's insistence) the computer summaries for this period. A.R. 1022–1105. For the period May 1975, through January 1976, published transfer prices did not exist when OHA's decision was issued, so the computer summaries that are in DOE's Supplement To Administrative Record were placed in the administrative record.

7. OHA directed that the requested transfer pricing data be submitted without information identifying the submitting firm because the information was confidential proprietary data and release might violate 18 U.S.C. § 1905. Decision and Order, Apr. 18, 1977. A.R. 920.

8. After it received the transfer price computer summaries, Getty lodged a wide variety of general objections, A.R. 1267–71, but filed neither a motion to compel nor a request for the 701 forms. Nor did Getty allege that its request had been misread. Getty was fully aware that there were such forms because Getty itself filed 701 forms.

ment on it, both in written and oral form, and it did so. A.R. 1267–84.

## IV. OTHER ISSUES RELATING TO THE CALCULATION OF THE OVERCHARGES.

In determining the amount of Getty's overcharge, OHA compared the value of the price-exempt foreign crude oil with the ceiling price of the domestic old oil given up by Getty in return for that foreign crude oil. In Table A of OHA's Decision and Order, OHA set forth the barrels of domestic old oil transferred to Sohio by Getty and the prices charged per barrel (which were the same as the ceiling price) for each month of the violation period. A.R. 1354. In Table B of the Decision and Order, OHA set forth the barrels of the two grades of foreign crude oil received by Getty and the transfer prices used by OHA to value them for each month of the violation period. A.R. 1355. In Table C of the Decision and Order, OHA set forth, in tabular form, the results of comparing the weighted average transfer price values of the foreign crude oil with the ceiling prices of the domestic crude oil. Table C sets forth the resulting overcharge for each month of the violation period and the total overcharge for the violation period.

Getty alleges that there is no record basis for the domestic prices utilized by OHA for five months or for the domestic or foreign volumes utilized by it the last three months of 1973. The DOE has declared its willingness to accept Getty's data on these matters and an appropriate adjustment will be made on remand.

■ Getty's primary attack on the calculation of overcharges focuses on OHA's determination of the volume of each grade of foreign oil that Getty received from Sohio during the last fifteen months of the violation period. Getty asserts that the OHA cannot rely on Table B's foreign crude oil figures for the period because the data were submitted by Sohio and Getty had no opportunity to challenge it by way of comment or rebuttal evidence.

It is undisputed that Getty did not have access to Sohio data on the volume of foreign oil transferred to Getty during this fifteen month period. While the DOE described Sohio data as confidential, it clearly was not confidential as to Getty. Moreover, while the DOE points out that Getty did not seek access to this data before the agency, prior to OHA's Decision and Order, Getty had no reason to believe that it was charged with overcharging during this fifteen month period. At the Remedial Order stage, as contrasted with the NOPV stage, the DOE was claiming that Getty had been guilty of overcharge violations from October of 1973 to October of 1974 and of violations of the entitlement program regulations between November 1974 and February 1976. It was for this reason that the Sohio volume data were never referred to or considered by the agency until OHA, while having the case under advisement, expanded the period of overcharge violations and secured the Sohio volume data in order to determine the amount of the overcharge in the last fifteen months.

Finally, the DOE argues that there is data available from Getty which suggests that the Sohio volume data is reliable and, if anything, slightly on the low side. However, this data was not before the agency, was not analyzed or accepted by it, and can't be used to retroactively supply substantial evidence to support the agency's order.

■ When the DOE orders the payment of restitution for overcharges and penalties, that action must be supported by substantial evidence. This means more than that there must be some evidence in the record to support the agency. As Judge Wilkie explained in *Mobil Oil Corporation v. FPC,* 483 F.2d 1238, 1258 (D.C.Cir.1973):

From this outline of the meaning of "substantial evidence," we can perceive the sort of procedures required. Clearly some evidence supporting the FPC's finding must be in the record. *More importantly for our purposes, the rule that the "whole record" be considered—both evidence for and against—means that the*

*procedures must provide some mechanism for interested parties to introduce adverse evidence and criticize evidence introduced by others.* This process of introduction and criticism helps assure that the factual basis of the [agency's decision] will be accurate and provides the reviewing court with a record from which it can determine if the agency has properly exercised its discretion.

In this matter, the Sohio foreign oil volume data for the last fifteen months of the violation period was not subjected to any critical testing or probing. Getty should have that opportunity before it is required to pay anything attributable to that period. The administrative record will not support an inference that the failure to provide that opportunity was harmless error.

## V. THE HEARING ISSUE.

■ Getty claims that the OHA's finding of liability with respect to the entire period of the alleged violation lacks substantial evidence because Getty sought and was denied an evidentiary hearing at which it could probe the evidence relied upon by the agency, particularly that supplied by Sohio. This claim is without merit, however.

While it is true, as Getty asserts, that early in the proceeding it "requested that certain Sohio and agency officials be subpoenaed so that [Getty] could confront and cross-examine them as to the nature of the transactions and the basis of the Remedial Order," Getty subsequently withdrew its request. At a conference held on March 30, 1977, the Director of OHA requested Getty to specifically identify those facts relevant to the proceeding which Getty wished to address in an evidentiary hearing. A.R. 869A, 877–883, 1315–1316. Getty responded that it did not need an evidentiary hearing regarding "issues arising solely from the Remedial Order" and did not request one. A.R. 886. Subsequently, with respect to

Sohio's affidavits specifically, Getty's attorney stated at one point:

There were some things in the Sohio affidavits that we dispute ... We would like to file a short statement of points in [sic] their affidavit. But that again is written and *we don't need a hearing on those things.*

A.R. 957–958 (emphasis added). Because Getty did not seek to cross-examine FEA or Sohio witnesses concerning the substance of the RO, it may not present those issues to this Court for review.[9]

Even if Getty had requested an evidentiary hearing on the issue of liability, however, one would not have been required. When asked by OHA to identify any disputed issues of fact as to which an evidentiary hearing would be helpful, Getty was unable to do so. It has similarly been unable to do so before this Court. Its briefing speaks of its interest in examining Sohio personnel on their "intent" in entering the agreements and on their accounting treatment of transfers under those agreements but there is no dispute here about what Getty and Sohio agreed to; there is no ambiguity in the language of the contract which needs to be clarified by parole evidence. The liability issues are legal ones: What is the substance of the contractual arrangements which the parties entered and what should the consequences be given the congressional intent behind the Mandatory Petroleum Pricing Program? The subjective intent of Sohio simply does not assist in resolving those issues and it is apparent from the decision of OHA that the result would have been no different, for example, even if Sohio had reported on and accounted for the transaction in a matter contrary to the position which it took in this proceeding.

## VI. THE DISCOVERY ISSUE.

When Getty withdrew its request for an evidentiary hearing, it cited as one of its reasons the failure of OHA to grant it all of

**9.** Prior to withdrawing its request, Getty had sought an evidentiary hearing on four issues which are no longer relevant. A.R. 887–890. Three of them concerned entitlements and one concerned alleged improper congressional pres-

sure. Getty was not prejudiced by its denial of an evidentiary hearing on these issues. *E.g., Amalgamated Meat Cutters v. Cost of Living Council,* 497 F.2d 1360, 1364 (TECA 1974).

the discovery it had sought. Getty renews that argument here, claiming that it was materially prejudiced by the failure of OHA to permit discovery concerning how Sohio viewed its dealing with Getty and to produce the raw data underlying the transfer price index. As I have already indicated, however, Sohio's treatment of those dealings was not material and Getty did not ask for the form 701 data.

## VII. THE DUE PROCESS ISSUE.

I have reviewed the record in this case and cannot subscribe to Getty's theory that the proceedings below were fundamentally unfair.

## VIII. THE "RESTITUTION" ISSUE.

[8] As earlier noted, OHA found that, due to the cost pass through provisions of the Price Control Program, and after November 1974, the operation of the Entitlements Program, "the persons adversely affected by the Getty overcharges ... [could] not be identified by reasonable measure." A.R. 1350. It then concluded as follows:

We have concluded that Getty should be directed to remit the amount of its overcharges plus interest to the United States Treasury. This is the only remedial action which the DOE can require in this case which will prevent the unjust enrichment of Getty, Sohio or any other refiner, and also achieve the agency's objective of compensating the ultimate victims of Getty's unlawful conduct: the public at large.

Getty does not contest OHA's finding that it is not feasible to trace the overcharges to their ultimate destination; it does, however, challenge the agency's authority to order that it make overcharge repayments to the United States Treasury. Specifically, it charges that OHA's order exceeded its statutory authority and was not authorized by its regulations. I disagree.

It has been held that the DOE has implied statutory authority to issue remedial orders requiring refunds of overcharges. *Bonray Oil Co. v. Department of Energy,*

472 F.Supp. 899 (W.D.Okl.1978), *aff'd and opinion adopted,* 601 F.2d 1191 (TECA 1979). While acknowledging that "an agency order to refund overcharges is neither specifically authorized nor forbidden in the ESA and the EPAA," the Court concluded that such authority was necessary to the effectuation of "broad purposes of the Congressional mandate in" those statutes. 472 F.Supp. at 903–04.

There is, accordingly, no doubt that OHA could have ordered Getty to refund the overcharges to identified purchasers of petroleum products, if the purchasers who ultimately bore the economic impact of the overcharges could be identified. The remaining question is whether the fact that it is not feasible to identify these victims deprives the agency of authority to require an overcharger to disgorge his ill-gotten gains. Reference to the statutory objectives from which the implied authority to issue refund orders arises demonstrates that it does not.

The DOE inherited a broad mandate. Section 102 of the DOE Act, 42 U.S.C. § 7112, states that one of the Act's purposes is "to promote the interests of consumers through the provision of an adequate and reliable supply of energy at the lowest reasonable cost." The FEA Act, 15 U.S.C. § 761 *et seq.,* declared among its purposes that of maintaining "fair and reasonable consumer prices" for scarce energy supplies, 15 U.S.C. § 761(a), and directed the Administrator to "prevent unreasonable profits within the various segments of the energy industry." 15 U.S.C. § 764(b)(5). Among the national energy goals set forth in the EPAA, 15 U.S.C. § 751 *et seq.,* is "equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices." 15 U.S.C. § 753(b)(1)(F). In the context of preventing "unreasonable profits" and "inequitable prices", a distinction between cases in which the victims are identifiable and those in which they are not seems inappropriate. In either case, disgorgement renders it unprofitable to charge above the ceiling price.

Taking this view of its statutory mandate, the FEA adopted Section 205.195(a),

10 C.F.R. § 205.195(a) (1977), which provides not only that a remedial order "may include a direction to make refunds directly to any purchasers of the product involved" but also that it may require the person "to take such other actions as the FEA determines is necessary to eliminate or to compensate for the effects of a violation." The OHA's order in this case is clearly designed to eliminate one of the principal effects of Getty's violations.

There is reason to believe that TECA shares the view that an inability to trace the deleterious effects of an overcharge does not impair the authority of DOE to prevent unjust enrichment. In *Citronelle-Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717 (TECA 1982), *cert. denied* —— U.S. ——, 103 S.Ct. 172, 74 L.Ed.2d 141 it observed:

> Actions by the United States under ESA § 209 are taken to enforce public, not private, rights. Thus, compensation is "a by-product of the agency's effort to re-establish compliance with its regulatory scheme." *Bulzan,* supra [*v. Atlantic Richfield Co.,* 620 F.2d 278] at 282. The central purpose of restitution is to determine the amount by which the wrongdoer has been unjustly enriched, and then to make him disgorge that amount. No proof is required that the plaintiff was damaged, much less the amount of any damage:
>
>> Restitution is generally awarded only in order to deprive the defendant of enrichment obtained at the plaintiff's expense ... the general requirement does not mean that the gain to the defendant need be equated to the loss of the plaintiff, nor indeed that there need be any loss to the plaintiff except in the sense that a legally protected interest has been invaded.
>
> Restatement of Restitution, Sec. 1, Comment e (1937) cited in *Sauder v. Doe,* 648 F.2d 1341 (TECA 1981).

669 F.2d at 722–23.

Nor am I able to conclude that the agency abused its discretion in requiring Getty to pay the overcharges into the Treasury.

## IX. THE INTEREST ISSUE.

In *Bonray Oil Co. v. DOE, supra,* TECA specifically upheld the agency's authority to assess interest as part of its inherent authority to effectuate restitution. Getty attempts to distinguish *Bonray* on the grounds that it involved payment to overcharged parties, not refunds to the Treasury, but this is a distinction without a difference. DOE's remedial authority is restitutionary in nature. *Citronelle-Mobile Gathering, Inc. v. Edwards, supra,* 669 F.2d at 722. Thus, the amount owed is measured by the amount by which the wrongdoer. is unjustly enriched, which includes the value of the beneficial use of the money *prior to* disgorgement.

Getty also contends that the rates of interest applied to it should have been promulgated in accordance with rulemaking procedures and therefore can not be applied. There is no indication, however, that OHA had a substantive rule regarding interest rates on restitutional remedies. The interest rate appears to be determined on a case-by-case basis following an opportunity for a party charged with a violation to comment about the appropriate rate of interest. In such situations, an agency is not applying an across-the-board rule which requires notice and comment rulemaking. *See Pacific Gas and Electric v. FPC,* 506 F.2d 33 (D.C.Cir.1974).

## X. THE "INADEQUATE RECORD" ISSUE.

█ Getty has vigorously maintained from the outset of this case that the administrative record certified by the agency to this Court was incomplete. Since there was reason to believe this might be the case, I permitted Getty to take discovery regarding the completeness of the record. That discovery and a number of court rulings on the meaning of "the administrative record", have resulted in supplements to the administrative record being filed by the agency. Despite these supplements, Getty contends that the record remains incomplete.

One must acknowledge the possibility that the administrative record may be incomplete. The agency's record keeping at the time of the proceedings below left much to be desired and we know there are at least a few documents which were before the decisionmakers but did not find their way into the record. One must also acknowledge that it is no longer feasible to reconstruct a perfect record. In these circumstances, I think the relevant question is whether there is any reason to believe there may have been a *material* omission from the record. In this case, I believe the answer is no.

In this context the concept of materiality has two facets. First, a reviewing court must inquire whether there is evidence in the administrative record to support each material finding of the agency. If there is not, whether because the agency had no such evidence or whether such evidence as it had was not included in the administrative record, the agency order cannot be sustained. Even if the record contains support for each material finding, however, one must also inquire whether there is reason to believe the agency was exposed to information not in the record which would cast those findings and the evidence supporting them in a substantially different light. If so, the final agency action should not be sustained despite the presence of record support for the conclusion reached. On the other hand, if one can say with confidence that any suggested omissions are immaterial in light of the issues in the case, the content of the administrative record, and the available information concerning possible gaps in the record, the agency's action should be enforced.

As indicated by the foregoing discussion, this case on its merits [10] presented the agency with the following issues: (1) did the foreign crude received by Getty constitute a part of the consideration for its domestic crude, (2) what were the volumes of the foreign and domestic crude delivered, (3) what was the value of the foreign crude, and (4) what should the remedy be. I find no reason to believe that any information relevant to these issues was omitted from the administrative record. I will comment on only two of Getty's arguments to the contrary.

Getty suggests that the decisionmakers considered documents from its compliance and investigation files which are not in the record and that this is important because those files may establish whether or not Sohio treated the value of the foreign oil as a part of its cost as asserted in the October 7th Decision. I have already found, however, that the most likely inference is that the decisionmakers did not consider documents from these files other than those which are in the administrative record. More important, it would not be legally material if they had. While it is true that the October 7th Decision finds, based on a presentation by Sohio, that it booked the transaction in a particular manner, as previously indicated, I think it apparent that the decision would have been no different without that finding. After all, OHA determined that the foreign oil was consideration for the domestic despite the fact that Getty did *not* treat the foreign oil as part of the consideration for the domestic oil which it delivered. The import of the decision was that the legal effect of the Getty-Sohio dealings were determined by the economic effect of the terms they agreed upon.

Getty's position with respect to transfer pricing data is more tenable, but nevertheless unpersuasive. As earlier noted, the administrative record affirmatively reflects that OHA used the transfer price index formulated by the FEA pursuant to 10 C.F.R. § 212.84 to calculate Getty's overcharges. Prior to its decision, FEA had published transfer prices for the months of October 1973 through May 1975 in the Federal Register. Transfer prices for the period June 1975 through January 1976 had not

---

**10.** Getty raised a claim of improper congressional influence before the agency relying on *Pillsbury Company v. FTC*, 354 F.2d 952 (5th Cir.1966). This issue is no longer material, however, since the agency gave Getty the remedy to which it would have been entitled had it proven this claim. *See* my Opinion of May 4, 1978.

been so published and OHA used transfer pricing computer summaries to get the figures for those months.[11] These summaries were not a part of the record as originally certified, but were later included pursuant to order of this Court. Getty continued to insist, however, that the administrative record should contain the Form 701's filed by the reporting companies which reflect the raw data from which the FEA transfer pricing index is derived. While I am inclined to the view that OHA can utilize an appropriate index maintained by a public agency without including in the administrative record the underlying raw data which it did not consult, I agreed with Getty that it should have the opportunity to verify the index figures if it wished to do so and I ordered the agency to supply that raw data. Having had access to this data, however, Getty is unable to point out any significant error in the figures utilized by OHA.

In summary, there may have been documents considered by the decisionmakers which are not in the administrative record as it currently exists. Nevertheless, except to the extent noted elsewhere in this opinion, that record provides support for the findings of OHA and, despite extensive discovery by Getty in this Court, there is no reason to believe that there is any omitted data which would cast those findings in a significantly different light. In these circumstances, a dispute about the completeness of the record does not, per se, bar summary judgment in favor of the agency.

## XI. MISCELLANEOUS ISSUES.

It follows from the views heretofore expressed that the remaining contentions of Getty cannot be sustained. Specifically, the October 7th Decision's interpretation of the term "price" did not constitute rulemaking and did not require notice and opportunity for comment. OHA's use of the transfer price index similarly did not require notice and comment rulemaking. The same is true of the decision to require restitution to the United States Treasury.

Moreover, the October 7th Decision did not render Getty liable for the conduct of Sohio and it is not true that it was deprived of the ability to conform its own conduct to the requirements of the law.

## XII. CONCLUSION.

Getty's multitudinous attacks on OHA's October 7th Decision and Orders are without merit for the most part. OHA acted within its authority in determining that the value of the foreign oil received by Getty under the 1973 contracts was part of the consideration or "price" which it received for its domestic oil and, accordingly, that there had been a ceiling price violation. Under the circumstances which confronted it, OHA, in devising a remedy, likewise acted within its authority in ordering payment of the overcharges to the United States Treasury.

The October 7th Order, however, includes amounts attributable to OHA findings which were not supported by substantial evidence. Those findings relate to the regulatory consequences of the 1972 agreements and to the last fifteen months of the overcharge period. A remand to the agency will be required for proceedings consistent with this opinion. In the course of that remand, the agency will make the adjustments to its calculation of the overcharges that it agreed to during the proceedings before this Court. It may or may not choose to address the issue raised in its second counterclaim.

---

11. The data was later published in 44 Fed.Reg. 30721 (May 29, 1979).