GETTY OIL COMPANY,
Plaintiff-Appellant,
v.

DEPARTMENT OF ENERGY, et al.,
Defendant-Appellee,
and
United States of America,
Counterclaimant-Appellee.

No. 3-37.

Temporary Emergency Court of Appeals.

Argued March 8, 1984.

Decided Sept. 26, 1984.

Certiorari Denied Feb. 19, 1985.
See 105 S.Ct. 1176.

William E. Wickens, Surrey & Morse, Washington, D.C., with whom William Simon, P.C., and Robert J. Brookhiser of Howrey & Simon, Washington, D.C., Charles F. Richards, Jr. and Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, Del., were on the brief; R. David Copley and Robert E. Hafey, Los Angeles, Cal., of counsel, for plaintiff-appellant.

David A. Engels, Dept. of Energy, Washington, D.C., with whom Larry P. Ellsworth and Charles L. Cope, Washington, D.C., of the same agency; William C. Carpenter, Asst. U.S. Atty., Wilmington, Del., and David M. Glass, Dept. of Justice, Washington, D.C., were on the brief for defendant-appellee and counterclaimant-appellee.

Before HOFFMAN, METZNER and LACEY, Judges.

METZNER, Judge.

Getty Oil Company ("Getty") appeals from a final order of the district court granting summary judgment to the Department of Energy [1] ("DOE") and the United States. This order embraces an opinion affirming a decision and order of DOE's Office of Hearings and Appeals ("OHA"), which found that Getty had violated DOE's producer price regulations, 10 C.F.R. Part 212 (1974), in its sales of domestic crude oil to Standard Oil Company (Ohio) ("Sohio"). In this opinion the district court also found that DOE had not abused its discretion in ordering Getty to make repayment of the amount of its overcharges to the Treasury, and that DOE had authority to assess Getty prejudgment interest on the amount found to have been overcharged. The final order also covers a memorandum reaffirming the award of prejudgment interest.

*I*

█ On appeal, DOE relies on the language of two contract documents signed by

---

**1.** For ease of narration, this opinion shall include the predecessor agencies, Federal Energy Administration and Federal Energy Office in "DOE."

Getty and Sohio on May 16, 1973, to sustain its position. Getty agrees in its reply brief that "the material facts are undisputed," and that only a question of law is presented as to the main question raised on this appeal. That question is whether DOE correctly determined that the 1973 documents jointly comprised one integrated agreement by which Getty traded domestic crude for Sohio's foreign crude with money payments merely equalizing the net values received.

The relevant facts are set forth in the district court's opinion, *Getty Oil Co. v. Department of Energy*, 569 F.Supp. 1204, 1206–08 (D.Del.1983), and familiarity with that opinion is assumed. Briefly, Getty and Sohio executed two documents on May 16, 1973. One provided for Sohio to sell 25,000 barrels per day of foreign crude oil to Getty to be delivered outside the United States. Getty used this oil to fulfill contracts it had in the Far East. The other provided for Getty to sell an identical amount of domestic crude to Sohio in this country. Similar trades are common in the oil industry. They provide each party with the oil it needs at a place where it is needed, at a cost lower than that which would be incurred if each company had to ship its oil to a distant location. The agreements were for a term from January 1, 1974 to January 1, 1977, with one year extensions subject to termination on twelve months' notice.

These documents were intended to continue a relationship whereby Getty supplied Sohio with domestic oil, while British Petroleum ("BP") supplied Getty with foreign oil. BP's parent company had a 26 per cent interest in Sohio. It was Sohio's assumption of BP's role as supplier to Getty that produced the instant problem.

The price for the purchase of domestic oil by Sohio was "the posted prices" or "the price which Getty Oil may lawfully charge, which may in no event exceed such posted prices." The price for the purchase of foreign oil by Getty was the domestic price less fixed differentials for Iranian Light Export oil and Abu Dhabi Export-Murban oil. The fixed differentials reflected the differences between the domestic and the foreign prices in effect in May 1973. The price of the foreign oil was subject to renegotiation at the request of either party. Cash payments were to be made under the contracts for the oil received.

As the district court observed, the two contracts "were coextensive in duration, expressly related to each other in respect to price, volume, term and termination, negotiated at the same meeting and executed on the same date." 569 F.Supp. at 1209. In addition, the domestic sales contract provided that should Sohio ultimately not supply Getty with the same amount of foreign oil as Getty had supplied Sohio domestically, Sohio would redeliver to Getty a sufficient quantity of domestic oil to make the total number of barrels delivered under each contract equal. The district court found that Getty and Sohio would not have executed one contract without concurrently executing the other, so that it was not surprising that DOE eventually concluded that "the value bargained for under one ... contract [w]as part of the consideration for the ... oil supplied under the other." *Id.* at 1210.

The producer price regulations in effect for 1974–76 provide that "no producer may charge a price higher than the lower tier ceiling price for any first sale of domestic crude oil." 10 C.F.R. § 212.73(a) (1974). "Price" includes "any consideration for the sale of any property or services and includes commissions, dues, fees, margins, rates, charges, tariffs, fares, or premiums, regardless of form." 10 C.F.R. § 212.31 (1974). The regulations do not define "consideration."

It is undisputed that the monetary price charged by Getty for its domestic oil under the 1973 agreements was permissible under Section 212.73(a). It is also undisputed that after the general price increases for foreign oil in late 1973, the price Getty charged for its oil exceeded the regulatory maximum if the foreign and domestic crudes were indeed consideration for each other.

A regulatory agency is no more bound than is a court by the form in which regulated parties choose to cast a transaction, but may look beyond form to the economic substance, in order to further the regulatory purpose of Congress. *Tenneco v. F.E.A.,* 613 F.2d 298, 302 (Temp.Emer. Ct.App.1979); *Mobil Oil Corp. v. F.P.C.,* 463 F.2d 256 (D.C. Cir.1971), *cert. denied,* 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972). That is precisely what DOE sought to do in this instance.

The district court correctly affirmed the finding by DOE that the documents constituted a single integrated transaction as a matter of law.

## II

Getty argues that DOE itself initially recognized that Getty's treatment of the transactions was lawful. DOE went so far as to issue a Notice of Probable Violation ("NOPV") to Sohio declaring that the transactions were separate. Furthermore, certain agency personnel continued to view the sales as distinct even after that NOPV was withdrawn.[2]

Finally, Getty notes that the agency did not promulgate regulations deeming matching purchases and sales of crude oil to be exchanges until December 1978, 43 Fed.Reg. 59,810, 59,813 (12/21/78). Accordingly, Getty contends, the agency exceeded its authority in finding that Getty had committed a price violation by imposing sanctions upon Getty when the applicable law and regulations did not provide fair notice that the company's treatment of the transactions was improper. *See Tenneco,* 613 F.2d at 303; *Longview Refining Co. v. Shore,* 554 F.2d 1006, 1014 n. 20 (Temp. Emer.Ct.App.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977).

The NOPV to Sohio was issued on October 11, 1974, and revoked only three weeks later. The promulgation and retraction of that short-lived NOPV did not constitute an admission by DOE that the regulations were so confusing that the proper construction of the 1973 documents was impossible to ascertain. *Cf. Department of Energy v. Louisiana,* 690 F.2d 180, 189 (Temp.Emer. Ct.App.1982) (agency reinterpretation of a regulatory term not an indication that term was unclear). The internal DOE memoranda discussing the propriety of the agency's action are of no consequence. After thorough consideration, DOE adopted its position concerning the 1973 Getty-Sohio agreements in August 1975, and has adhered to that position ever since. *See Mobil Oil Corp. v. Tully,* 653 F.2d 497, 501-02 (Temp. Emer.Ct.App.1981), citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). The FEA memoranda cited by Getty do not evince a pattern of public pronouncements to the contrary. *Compare Standard Oil Company v. Department of Energy,* 596 F.2d 1029, 1052-56 (Temp.Emer.Ct.App.1978).

In fact, there was no ambiguity or vagueness in the regulations as they applied to this transaction. The lack of a regulation covering this type of transaction does not mean that there is any confusion.

The problem in this case is one of contract law. While there was no definition of "consideration" in the regulations, that term is clearly defined in the law. In a bilateral contract, which exists here, the promise by one party is the consideration for the promise by the other party. 1 Corbin, CONTRACTS, sec. 142, p. 611 (1963). Getty promised to furnish crude oil and money to Sohio which in turn promised to furnish crude oil and money to Getty. In any litigation over the terms and effect of a contract, the losing party is not excused from paying damages because it had a belief that its actions were in conformity with the law applicable to the transaction.

With the advent of controls, the price Getty could charge Sohio for domestic oil was frozen at the maximum lawful price. Getty could not complain about that since

2. Throughout 1975 and 1976, various DOE personnel were uncertain that Getty, and not Sohio, had violated the existing regulations. *See, e.g.,* the materials reproduced in the Appendix at pages 4610, 4617–19, 4628, 4631, 4633, 4645, 4658–59, 4677–78 and 4681–83.

every seller of domestic oil was treated equally. However, the price of foreign oil here was tied to the domestic price, with the result that Sohio was required to deliver expensive oil to Getty for the relatively cheap oil it was receiving.

Neither party wanted nor expected to make money on this transaction. The proviso in the foreign oil document for price renegotiation on the request of either party supports this view. If the price of foreign oil went up, as it did here, Sohio could request renegotiation and Getty had two options. It could either agree to change the differentials or terminate the contract. In the latter event Getty would have to purchase its requirements in the open market. In either event it would end up paying the increased price of the foreign oil it needed in relatively the same amounts as it is being called upon to pay under DOE's order. Getty is not being penalized nor treated unfairly by the order of DOE.

The observation is in order that if for some reason the price of foreign oil went down in terms of the fixed differentials, Getty would have requested renegotiation downward of the foreign price.

### III

Getty has made several other arguments which are discussed below.

A. The application of the substantial evidence rule was argued extensively in Getty's main brief. However, in its reply brief on p. 8 it says:

"In this case, the material facts are undisputed and based entirely on a paper record. Under the circumstances, the substantial evidence rule does not apply,

because the consideration question is a question of law which is subject to *de novo* review, and this Court is under no obligation to defer to the agency's legal conclusions."

B. Getty also asserts that it was improperly denied certain discovery, as well as an evidentiary hearing it had requested on disputed issues of fact. Even if those allegations are true,[3] Getty's statement on appeal that there are now no disputed material facts renders that objection moot. Moreover, since the Sohio 701 forms which Getty had sought were provided to it during the proceedings in the district court, it had the opportunity to examine them before making its arguments on appeal.[4]

C. Under the regulations governing the entitlements program at the times involved in this case, if Sohio and Getty had indeed exchanged their crudes one for the other, then "no volumes of old oil [would have been] deemed to have been transferred." 10 C.F.R. § 211.67(g) (definition of an "exchange" for purposes of the entitlements program). Rather, Getty and Sohio would each have been deemed to have retained the crude they had delivered to the other party. Getty contends that as a result, even if the 1973 agreements had constituted an "exchange" of crude, Getty could not have violated the producer price regulations since under the regulations as a whole it would not be deemed to have parted with any of its domestic oil.[5]

The entitlements regulations were imposed to preserve the domestic supply of lower-priced oil, and Section 211.67(g) ensured that domestic old oil would not vanish from the nation's supply by means of

---

3. *See* Appendix at 1043–44.

4. This case is distinguishable from *Gonzales v. United States*, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955), relied on by Getty to support its argument that the production of Sohio's 701 forms at the district court proceedings did not cure DOE's failure to produce them while the agency proceedings were pending. *Gonzales* dealt with nonproduction of the document before the Selective Service Appeal Board whose determination is "considered 'final' in the courts, not to be overturned unless there is no

basis in fact." 348 U.S. at 412, 75 S.Ct. at 412. By contrast, here the court may overturn DOE's action if it either exceeded the agency's authority, or was not founded upon substantial evidence. Consequently, Getty had the opportunity to reargue the facts in the district court.

5. It is worthy of note that certain Getty personnel submitted affidavits in which they strenuously denied that the 1973 contracts worked an "exchange" for purposes of the entitlement regulations. *See, e.g.,* Appendix at 484, 507.

such trades or exchanges. We are not concerned with the entitlements program in this case.

■ D. Section 211.63 provides that "[a]ll contracts for sales, purchases and exchanges of domestic crude oil in effect on December 1, 1973 shall remain in effect for the duration of this program ...." Getty argues that whatever the original effect of the 1973 agreements between it and Sohio, after January 1, 1974, when Section 211.63 came into force, the two agreements were clearly supported by separate consideration because Getty was unable to cancel the domestic agreement even if Sohio had terminated the foreign one.

That the 1973 agreement may have been *severable* after the promulgation of Section 211.63 does not mean that it necessarily *became* two separate agreements after that date. Section 211.63 mandated the continuation of the domestic part of the 1973 contracts in the face of potential developments, but did not change the nature of the consideration flowing between Getty and Sohio under the contracts then in place. Furthermore, the regulation did not prevent Getty from exercising any right to terminate since it never was in a position to do so under the agreement. It had this right only if Sohio chose to terminate the foreign oil portion which Sohio never did.

■ E. Getty argues that in its decision and order DOE "dramatically changed the theory of the violation with which Getty was charged," denying Getty adequate notice that it was being charged with a price violation for the period November 1974 to February 1976. The basis for liability for this period was the same as that for the period immediately preceding for which Getty did receive notice and which it fully litigated. It was not prejudiced in the least

by the addition of the later time period. Furthermore, it has stipulated the amount of damages for that period.

F. As Getty observes, "the proper disposition of the funds which Getty was ordered to pay to the United States Treasury ... has not been raised by any of the parties and is therefore not properly before this Court." [6] Presently DOE has issued an interlocutory order regarding future proceedings as to the disposition of the funds. Interlocutory Order, Case Nos. HRR–0071, HCX–0091, November 29, 1983. This matter is remanded to the district court to modify its judgment to provide that the amount of damages shall be deposited in the district court in an appropriate interest-bearing account pending further order of the court after DOE has acted upon the remand. We assume that DOE will consider the rights of all parties, including Getty and any parties seeking to intervene, if they have such rights, to the proper disposition of these funds.

■ G. Finally, Getty contends that the district court's allowance of prejudgment interest was in error because the amount of the claimed overcharges was uncertain. The district court has adequately and correctly disposed of this issue.

*IV*

For the reasons stated, the judgment of the district court is modified as indicated above, and affirmed as so modified.

6. Reply brief at 11, n. 14.