**GETTY OIL COMPANY, Plaintiff,**

v.

**The DEPARTMENT OF ENERGY, et al., Defendants,**

**and**

**United States of America, Counterclaimant.**

**Civ. A. No. 77–434 MMS.**

United States District Court, D. Delaware.

Aug. 21, 1987.

Robert K. Bester, Jr., of Biggs & Battaglia, Wilmington, Delaware, of counsel: William E. Cohen, and Laurence A. Short, of Short, Klein & Karas, P.C., Washington, D.C., for Atlantic Container Line, Associated Container Transp., Compagnie Generale Maritime, Cunard Line Ltd., The Cunard Steamship Co., PLC., El Al Israel Airlines, Ltd., Iberia International Airlines, Intercontinental Transport (ICT), B.V., Japan Air Lines Co., Ltd., KLM—Royal Dutch Airlines, Lan-Chile Airlines, Lufthansa German Airlines, Puerto Rico Marine Management, Inc., Rederi Soya AB, Rederiaktiebolaget Transocean, Singapore Airlines Ltd., Swissair, and Swiss Air Transp. Co., Ltd.

Michael Hanrahan, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., of counsel: Philip P. Kalodner, Philadelphia, Pa., for Elec. Utilities Consolidated Edison Co. of New York, Inc., Southern California Edison Co., Long Island Lighting Co., Pacific Gas and Elec. Co., Orange and Rockland Utilities, Inc., San Diego Gas and Elec. Co., Yamashita—Shinnihon, S.S. Co., Ltd., Nippon Yusen Kaisha, Japan Line Ltd., N.V. Bocimar S.A., Star Shipping A/S, Globe Trade and Transp. Co., Ltd., Showa Line Ltd., The Sanko S.S. Co., Ltd., Island Nav. Corp. (Ship Management) Ltd., Shinwa Kaium Kaisha, Ltd., Kawasaki Kisen Kaisha Ltd., Mitsui O.S.K. Lines Ltd., Daiichi Chuo Kisen Kaisha, Flota Mercante Grancolombiana S.A., Champion Intern. Corp., Weyerhaeuser Co., Federal Paperboard Co., Inc.

William W. Erhart, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for the states and territories of Ark., Del., Iowa, La., N.D., R.I., W.Va., Hawaii, Ill., Nev., N.C., Neb., Guam, the V.I., Cal., Conn. and Mich., of counsel for the states of Ark., Del., Iowa, La., N.D., R.I. and W.Va., only: Andrew P. Miller, Milton B. Whitfield, and J. Bradley Ortins, of Dickstein, Shapiro & Morin, Washington, D.C., of counsel for the states and territories of Hawaii, Ill., Nev., N.C., Neb., Guam and the V.I. only: Bernard Nash, and Edward G. Modell, of Blum, Nash & Railsback, Washington, D.C., of counsel for the states of Cal., Conn. and Mich. only: James E. Flug, and

William O. LaMotte, III, and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., of counsel: William E. Wickens, Paul A. Koches, and Frank J. Pergolizzi, of Wickens, Koches & Cale, Washington, D.C., for Getty Oil Co.

William C. Carpenter, Jr., U.S. Atty., and Sue L. Robinson, Asst. U.S. Atty., Dept. of Justice, Wilmington, Del., Theodore Miles, Marcia K. Sowles, Charles L. Cope, II, Stephen C. Skubel, and Paul Geier, U.S. Dept. of Energy, Washington, D.C., for Dept. of Energy and U.S.

Paul Dinerstein, of Lobel, Novins, Lamont & Flug, Washington, D.C.

Robert J. Katzenstein, of Lassen, Smith, Katzenstein & Furlow, Wilmington, Del., of counsel: Marc J. Fink and David F. Smith, of Dow, Lohnes & Albertson, Washington, D.C., for Christian Haaland A/S, Columbus Line, Compania Transatlantica Espanola S.A., Constellation Line, Hapag-Lloyd A.G., Italian Line, S.p.A., Kuwait Maritime Corp., A.P. Moller-Maersk Line, Nedlloyd Lines, Ocean Transp. and Trading P.L.C., Rederi-aktiebolaget Transatlantic, V.A.G. Transport, Wilh. Whilhelmsen Ltd. A/S, and Zim-American Israeli Shipping Co.

## MEMORANDUM OPINION

MURRAY M. SCHWARTZ, Chief Judge.

One wishes the adage of General Douglas MacArthur about "old soldiers" applied equally to price-controlled crude oil cases; alas, it does not. A group of private businesses, variously operating ocean carriers, air carriers, utilities, surface transporters, and manufacturing concerns (collectively "Carriers"), all of whom are petroleum product purchasers, have petitioned to intervene in the present proceeding reviewing the Department of Energy's ("DOE") decision concerning restitution of crude oil overcharges from Getty Oil Company ("Getty"). The Carriers argue they should be permitted to intervene as of right under Federal Rule of Civil Procedure 24(a), or in the alternative that the Court permit permissive intervention on the restitution issue under Rule 24(b). The DOE and individual states, who the Court allowed to intervene permissively with DOE's consent, oppose any intervention by private parties.[1] Not unexpectedly, this case has a complex history made more labyrinthine by intervening statutory, administrative, and judicial actions on the issue of petroleum overcharge restitution. The Court will review the procedural process in the area of crude oil overcharge refund policy as it relates to this case before turning to the motions to intervene.

## I. PROCEDURAL BACKGROUND

### A. The Getty Case

Getty entered into two agreements with the Standard Oil Company ("Sohio") on May 16, 1973, to buy and sell crude oil. The first contract, which is the basis of this decision, required Getty to sell to Sohio 25,000 barrels per day of predominantly old domestic crude oil, and purchase a like quantity of foreign crude oil. The agreement was in effect from January, 1974 to January, 1976. The Federal Energy Administration, the forerunner of DOE, issued a Remedial Order ("Order") to Getty on August 12, 1976, finding violations of certain price ceiling regulations. Getty then appealed to the Office of Hearings and Appeals ("OHA"), which affirmed the Order, on October 7, 1977, including the agency's decision on the proper remedy. Appeal of Getty Oil Co., 1 DOE ¶ 80,102 (1977). OHA concluded that "the Getty-Sohio transactions constitute an exchange for purposes of the DOE regulatory program ... they were [not] separate and independent purchases and sales...." *Id.* at 80,-525. OHA affirmed the calculation of petroleum overcharges equalling $84,624,845, and assessed prejudgment interest against Getty. *Id.* at 80,538. Included in the calculation of damages were overcharges during October-December, 1973, for transactions under separate 1971 and 1972 agreements between Getty and Sohio.[2]

---

1. Getty Oil Company has disclaimed any interest in the question of intervention insofar as it concerns distribution of the restitutionary funds presently controlled by the Court.

2. One issue not addressed in the DOE proceedings was Getty's liability for overcharges based on the cash differentials in the 1973 foreign agreement. The cash differential alleged violation involves the question whether the per-barrel cash differentials were additional considera-

tion for Getty's domestic crude oil, an issue different from the determination of whether the two 1973 agreements constituted a single transaction. DOE first raised that cash differential violation in its second counterclaim to Getty's appeal of the OHA decision to this court. DOE asserted in the counterclaim that the consideration Getty received exceeded the lawful ceiling price for domestic crude oil. Docket ("Dkt.") 12, ¶ 25. The court did not consider this claim in its review of the agency decision. *Getty Oil*

The remedy adopted by DOE in the administrative proceeding required Getty to remit the entire amount of the overcharges directly to the United States Treasury. OHA found that to be the only feasible method of achieving a fair restitution because "the persons adversely affected by the Getty overcharges cannot be identified by reasonable means." Appeal of Getty Oil Co., 1 DOE at 80,537. The remedy question is the issue underlying the intervention motion.

The district court affirmed DOE's Order in substantial part in July, 1983. The court upheld OHA's conclusion that the Getty-Sohio transfers under the 1973 agreements constituted an exchange and not discrete transactions, and therefore violated the established ceiling prices for old domestic crude oil. *Getty I,* 569 F.Supp. at 1209. In addition, the imposition of prejudgment interest and the restitutionary policy, involving repayment to the Treasury, were upheld. *Id.* at 1218. The court did reverse the agency's assessment of liability for the October-December, 1973 transactions due to the lack of adequate support for the finding in the record. *Id.* at 1209.

In September, 1984, the Temporary Emergency Court of Appeals ("TECA") affirmed the district court's ruling, finding Getty liable for the 1974–76 overcharges and remanding to DOE the issue of the October-December, 1973 overcharges for further hearings. *Getty I,* 749 F.2d 734 (Temp.Emer.Ct.App.1984), *cert. denied,* 469 U.S. 1209, 105 S.Ct. 1176, 84 L.Ed.2d 325. The court directed the district court to hold the overcharge fund in an interest-bearing account pending its final distribution, and directed DOE to reconsider the proper remedy. *Id.* at 739. TECA noted that DOE had already issued a notice of future proceedings on the disposition of the restitutionary fund, and instructed it to "consider the rights of all parties, including Getty and any parties seeking to intervene, if they have such rights, to the proper disposition of these funds." *Id.* at 739. As of June 30, 1987, the value of the fund, including interest, stood at $179,862,911.93 ("$180 Million Fund").

Upon remand of the restitutionary policy question to DOE, the case became enmeshed in policy developments arising from concurrent crude oil overcharge litigation and legislative actions.

## B. Restitutionary Policy Development

DOE has implied statutory authority to cure violations of oil price control regulations through remedial orders requiring refunds of overcharges. *Atlantic Richfield Co. v. Department of Energy,* 618 F.Supp. 1199, 1208–09 (D.Del.1985). Under authority granted by five economic regulatory statutes, DOE, through OHA, adopted regulations on the remedy question in 1979, called "Subpart V," to permit special refund procedures for petroleum overcharge victims where DOE "is unable to readily identify persons who are entitled to refunds specified in a Remedial Order...." 10 C.F.R. § 205.281. In *Atlantic Richfield Co.,* the Court summarized the general procedures under Subpart V for implementing a refund process:

> The special refund procedures may be triggered at the request of the Special Counsel of DOE, the ERA Office of Enforcement, or any other enforcement official of DOE when the criteria of § 205.280 are met. 10 C.F.R. § 205.281. When any of the above officials submits a 'Petition for the Implementation of Special Refund Procedures,' OHA must review its contents and issue a Proposed Decision and Order describing 'the nature of the particular refund proceeding and [setting] forth the standards and procedures that the Office of Hearing and Appeals intends to apply in evaluating refund claims.' 10 C.F.R. § 205.282. The proposed decision must be published in the Federal Register and the public must be given an opportunity to comment. *Id.* OHA then issues a final Decision and Order which delineates the

Co. v. Dept. of Energy ("Getty I"), 569 F.Supp. 1204, 1220 (D.Del.1983) (Stapleton, J.). DOE's most recent administrative decision found Getty liable for the cash differential overcharges. *See infra* note 3.

"standards and procedures" to be used in evaluating individual Applications for Refunds. The standards and procedures must be consistent with the provisions of Subpart V and must be derived with an eye toward the "efficient, effective and equitable" distribution of the funds and the resolution, to the maximum extent practicable, of all outstanding claims. *Id.* 'In order to do so, the standards for evaluation of individual claims may be based upon appropriate presumptions.' *Id.*

618 F.Supp. at 1209.

The question of overcharge refunds presented a number of complex problems, not the least of which is attempting to trace the effect of price violations through the various layers of the national economy. To note just one area of concern, under the Entitlements Program, 10 C.F.R. §§ 211.66, 211.67 (1975), designed to spread the cost of uncontrolled crude oil through the distribution system, it is virtually impossible to trace the harm from overcharges to individual firms. *See United States v. Exxon,* 773 F.2d 1240, 1284–85 (Temp.Emer.Ct. App.1985) (tracing increased costs would require audit of entire petroleum industry, which would be futile). The initial response of the courts and DOE to creating an equitable restutitionary system focused primarily on using the federal and state governments as the vehicles for applying refunds for the benefit of all consumers, the one group which had ultimately borne most of the overcharge costs.

A shift in focus began in *Citronelle-Mobile Gathering, Inc. v. Edwards,* where TECA rejected a district court's restitutionary order directing payment of the entire overcharge amount to the United States Treasury. The court stated that "the Government has a *duty* to try to ascertain those overcharged, and refund them, with interest, from the restitution funds." 669 F.2d 717, 723 (Temp.Emer.Ct.App.1982). TECA reached a similar conclusion in *Getty I* when it rejected the proposed transfer directly to the federal government and ordered this Court to hold the fund pending DOE's determination of a refund procedure for individual victims. 749 F.2d at 739.

District court orders directing payment into an escrow for distribution to the states to fund particular energy programs designed to benefit a broad class of citizens have also been specifically approved. *See United States v. Sutton,* 795 F.2d 1040, 1063–64 (Temp.Emer.Ct.App.1986); *Exxon Corp.,* 773 F.2d at 1286. In *Exxon Corp.,* TECA noted "the remedy chosen avoids further administrative delay and confusion, with additional costs, it prevents the frustration of congressional objectives in securing prompt enforcement of what has been denominated as 'emergency' price regulations, and it is a reasonable means to protect the public interest." *Id.* at 1287.

The monumental task facing the district court in *In Re Department of Energy Stripper Well Exemption Litigation,* involving distribution of an overcharge fund ultimately exceeding $1.7 billion, led to the development of more refined procedures by DOE for distributing refunds to individual victims of price violations. In order to develop the factual background necessary to permit equitable distribution to private claimants, the district court ordered OHA to conduct proceedings to "attempt[ ] to determine what parties bore the cost of overcharges and in what amounts." 578 F.Supp. 586, 596 (D.Kan.1983). In light of its factfinding for the Court, DOE adopted a Restitutionary Policy on July 2, 1985. 50 Fed.Reg. 27400 (1985). OHA had found "that it is impossible to trace the economic harm of the overcharges to particular firms or individuals." *Id.* Moreover, econometric modeling methods as an indirect means of determining injury were "too inexact." *Id.* at 27402. DOE recommended that the stripper well funds be held in an escrow account pending a decision by Congress of the best means of using the money. If Congress failed to act, then DOE recommended the amounts should be paid into the Treasury rather than have additional *ad hoc* distributions to the states because they "cannot make effective use of additional monies...." *Id.*

Upon OHA's report to the *Stripper Well* Court on June 21, 1985, extensive settlement discussions commenced between the

federal government, the states, and representatives of a broad spectrum of private petroleum purchasers. The parties came to terms, and the district court approved a Final Settlement agreement (*"Stripper Well* Agreement") on July 7, 1986. Dkt. 263.

A key provision was an agreement between DOE and the states concerning pending and future overcharge proceedings not specifically governed by the *Stripper Well* Agreement:

1. *Modification of Policy.* In order to carry out its remedial authority under the ESA and EPPA, within 20 days following the date of the Approval Order, DOE will issue a modification of the statement of Restitutionary Policy concerning Alleged Crude Oil Violations issued on June 21, 1985 (50 Fed.Reg. 27400; July 2, 1985). DOE will publish that modification (hereinafter the Modified Policy) in the Federal Register. The Modified Policy will state that the policy of DOE is to process applications for refunds pursuant to existing Subpart V regulations and that in such administrative proceedings involving Alleged Crude Oil Violations, OHA will continue to require that each claimant must affirmatively demonstrate that it has been injured by the alleged violation and that it should therefore receive a refund. *See e.g., Office of Special Counsel/Tenneco Oil Co.*, 9 DOE ¶ 82,538 at 85,206 (1982). The Modified Policy will state that individuals claiming such injury may file claims but OHA will not accept claims on behalf of classes, associations or trade groups. Nothing in the Modified Policy will preclude a claimant from attempting to prove injury through the use of econometric evidence of the type that was submitted in the Stripper Well evidentiary proceedings before the OHA nor preclude OHA from using the findings contained in the Report of the Office of Hearings and Appeals. *In re The Department of Energy Stripper Well Exemption Litigation,* M.D.L. No. 378 (D.Kan., filed June 21, 1985). Nothing contained herein may be construed to amend the Subpart V regulations.

*Stripper Well* Agreement IV.B.1. The parties specifically referenced the present action, determining that:

The matters in *Getty Oil Co.*, OHA Case No. HRR–0074 (and related cases), concerning the yet undetermined issues of liability remanded by the District Court in *Getty Oil Co. v. DOE*, C.A. No. 77–434 (D.Del.), are excluded from this Agreement, provided, however, that to the extent the funds arising out of such matters are determined to be Alleged Crude Oil Violations funds, the provisions of paragraph IV.B hereof shall apply.

*Id.* at III.B.6. (Emphasis added).

The *Stripper Well* Agreement created nine segregated escrow accounts through which various classes of private parties and governmental bodies could make individual claims for relief. The amount each party received included recovery in anticipation of crude oil overcharge funds DOE believed it would be entitled to receive in pending or future unrelated cases. In exchange for compensation of all their potential claims from the fund, the private parties agreed to waive any right to recover in other crude oil violation enforcement actions brought by DOE. *Id.* at III.A.1. Included within the release of future claims are funds "in escrows created or to be created by ... any court or agency." *Id.*

In response to the *Stripper Well* Agreement, DOE issued a Modified Statement of Restitutionary Policy ("MSRP"), adopting new procedures for distribution of a share of restitutionary funds to private claimants and abandoning the previous refund policy issued on July 2, 1985. 51 Fed.Reg. 27899. The MSRP provides for use of Subpart V refund regulations. In apportioning an overcharge fund, 20% is reserved for private claims, and the remainder is divided equally between the federal government and the states, with each state receiving its proportion under a distribution ratio determined in the *Stripper Well* Agreement. *Stripper Well* Agreement Exhibit H. OHA administers the claim procedures, and all private applicants for refunds "must demonstrate injury as a result of any al-

leged crude oil violations." 51 Fed.Reg. at 27901. As opposed to its earlier restitutionary policy, DOE now found indirect proof through econometric methods an acceptable manner of showing injury, but refused to permit class or associational standing to seek a share of funds. *Id.* DOE issued an Order on August 20, 1986, implementing the MSRP and announcing that it would apply to "all pending and future Subpart V cases." 51 Fed.Reg. 29689, 29691 (1986).

Subsequent to the *Stripper Well* Agreement and issuance of the MSRP, Congress enacted the Petroleum Overcharge Distribution and Restitution Act ("PODRA"). 15 U.S.C. §§ 4501–4507. PODRA applies to any funds recovered for violations of the Emergency Petroleum Allocation Act or the Economic Stabilization Act, "including any such amounts held in escrow by any court." 15 U.S.C. § 4501(a). The Act creates a "Special Rule" in § 4501(b) specifically applying PODRA to amounts held in escrow accounts by courts before the date of enactment. The operative provision is as follows:

> **(b) Disbursement of restitutionary amounts as direct restitution to injured persons**
>
> (A) The Secretary shall, through the Office of Hearings and Appeals of the Department of Energy, conduct proceedings expeditiously in accordance with subpart V regulations for the purpose of, to the maximum extent possible—
>
> > (A) identifying persons or classes of persons injured by any actual or alleged violation of the petroleum pricing and allocation regulations issued pursuant to the Emergency Petroleum Allocation Act of 1973 or the Economic Stabilization Act of 1970;
> >
> > (B) establishing the amount of any injury incurred by such persons; and
> >
> > (C) making restitution, through the disbursement of amounts in the escrow accounts described in subsections (b) and (d) of section 3002, to such persons.

15 U.S.C. § 4502(b)(1). Once restitution has been made to private parties, the funds are disbursed to the federal and state governments. 15 U.S.C. §§ 4502(d), 4503. PODRA does not, however, apply to:

> any amount to which any person or class of persons has an enforceable right, created or vested, or governed by the terms and conditions of the settlement approved on July 7, 1986, in In Re: the Department of Energy Stripper Well Exemption Litigation, M.D.L. No. 378, in the United States District Court for the District of Kansas; ....

15 U.S.C. § 4501(c)(2).

The House Budget Committee Report states, "[T]he legislation reaffirms (as does Judge Theis' Order [in *Stripper Well*]) the primary obligation of the DOE to make direct restitution to overcharged customers ... [I]t specifically directs DOE, acting (as is the case today) through [OHA] and the DOE's Subpart V regulations to provide direct restitution to such customers 'to the maximum extent possible' through a procedure that allows them to claim such funds." H.R.Rep. No. 727, 99th Cong., 2d Sess. 57 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 3607, 3653. The Conference Report similarly emphasized the principle of direct restitution, to the extent possible, to private entities and consumers, and the Conference Committee would "encourage and expect" DOE to provide the procedures to return the funds. H.R.Cong.Rep. No. 1012, 99th Cong., 2d Sess. 233 (1986), *reprinted in* 1986 U.S. Code Cong. & Admin.News 3607, 3878 (1986). PODRA and its legislative history demonstrate that an acceptable distribution plan for a crude oil overcharge fund must include a mechanism for direct restitution to injured private persons.

## II. INTERVENTION

On July 17, 1986, DOE issued its decision on distributing the $180 Million Fund to private parties and the federal and state governments.[3]  14 DOE ¶ 83,033 (1986).

---

**3.** Two additional questions decided by the agency involved the alleged October–December, 1973

violations, which the District Court had remanded, and the cash differential question not previ-

The agency concluded that it would apply the procedures and allocations developed in the *Stripper Well* Agreement, where DOE obligated itself to recommend the program outlined in the MSRP in other actions, *see Stripper Well* Agreement IV.B.8, to the $180 Million Fund. 14 DOE at 86,284. This entails reserving 20% of the fund for private restitution and distributing the remainder, plus any excess from the 20% reserve, to the federal government and the states equally. Claims for direct restitution will be administered under the Subpart V regulations in accordance with the policies delineated in the MSRP. *Id.*

A number of private parties and states participated in the DOE administrative process by submitting comments on the remedy issue. In addition, Philadelphia Electric Company, National Freight, Inc., RJG Cab, Inc., and Geraldine H. Sweeney filed a motion to represent a class of all oil-burning electric utilities and all surface transportation end users of oil products. DOE denied any participation by these parties as class representatives, but permitted intervention on an individual basis. *Id.* at 86,276. The same private parties filed a motion to intervene in this Court after TECA's decision in *Getty I* in 1985, again asserting their representative status. Dkt. 193. They ultimately withdrew the motion because they are parties to the *Stripper Well* Agreement and therefore cannot participate in other overcharge litigation. Dkt. 231. The Carriers now seeking intervention did not participate in the earlier administrative proceeding by DOE, nor are they parties to the *Stripper Well* Agreement.

The Carriers request intervention limited to the issue of the proper distribution of the $180 Million Fund. They move for intervention as of right or, in the alternative, ask the court to exercise its discretion by granting permissive intervention. If the Carriers are denied intervention, then they ask leave to appear as *amici curiae.*

**A. Intervention of Right**

Federal Rule of Civil Procedure 24(a)(2) provides:

> Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

In addition to the three requirements enumerated, courts will not permit the application unless it is timely. *See NAACP v. New York*, 413 U.S. 345, 366–69, 93 S.Ct. 2591, 2603–04, 37 L.Ed.2d 648 (1973). The key issue for the carriers' motion is whether they have a sufficient "interest" at this particular stage of the litigation to entitle them to intervene as of right.[4]

■ The meaning of "interest" is imprecise, and courts have only applied general criteria "designed to cover the multitude of possible intervention situations." *Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.*, 725 F.2d 871, 875 (2d Cir.1984). In *Donaldson v. United States*, the Supreme Court stated the proposed intervenor's interest must be "significantly protectable," 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1970), but did not discuss the types of interests that would qualify under the Rule.

TECA has not directly addressed the question of what constitutes the "interest" necessary to intervene as of right. The circuit courts that have considered the issue have attached terms such as "legally protectable," *Southern Christian Leader-*

---

ously addressed administratively. DOE found against Getty on both questions, and ordered it to remit a total of $24,265,682, plus interest, for the violations. 14 DOE ¶ 83,3033, 86,285–86 (1986). An issue has arisen regarding the proper forum to hear Getty's appeal on these questions, with Getty arguing that the Federal Energy Regulatory Commission is the proper body and DOE asserting this Court retains jurisdiction over the entire case. The jurisdictional issue is not presently before the Court.

4. DOE and the states also argue the Carriers' motion for intervention is untimely. In light of the Court's disposition of the motion on other grounds, this issue need not be addressed.

*ship Conference v. Kelley,* 747 F.2d 777, 779 (D.C.Cir.1984), or "direct," as opposed to contingent or remote, as the prerequisite for intervention. *See Restor-A-Dent Dental Laboratories, Inc.,* 725 F.2d at 874. The Third Circuit Court of Appeals extensively reviewed the meaning of "interest" in *Harris v. Pernsley,* noting that the judicial guidelines are "conclusory." 820 F.2d 592, 596–97 (3d Cir.1987). Although TECA has jurisdiction over any appeal in this case, *Harris* is the most recent appellate court analysis of the interest requirement in Rule 24(a), and the Court will use its analysis as an aid in deciding the Carriers' motion.

In *Harris,* the Court of Appeals directed its attention to "the practical consequences of the litigation in passing on a application to intervene as of right." *Id.* at 601. For example, the *stare decisis* effect of a decision may directly affect an applicant's interests to permit intervention. *Smith v. Pangilinan,* 651 F.2d 1320, 1325 (9th Cir. 1980). The Third Circuit appellate court held that a proposed intervenor "must do more than show that his or her interests may be affected in some incidental manner. Rather, the applicant must demonstrate that there is a tangible threat to a *legally cognizable interest* to have the right to intervene." *Harris,* 820 F.2d at 601 (Emphasis added).

In applying the "legally cognizable interest" formulation to the Carriers' motion, the statutory basis of the DOE enforcement action determines whether they can intervene. Both the administrative proceeding and DOE's counterclaims are brought under § 209 of the Economic Stabilization Act ("ESA"), 12 U.S.C. § 1904 note, which authorizes actions to enjoin practices which violate DOE regulations. Section 210 of the ESA authorizes private treble damage suits by persons injured as a result of violations. In *Cities Service Co. v. Department of Energy,* TECA held that "[w]hile sections 209 and 210 have a common purpose—the enforcement of DOE's regulations—they vindicate different rights." 715 F.2d 572, 573 (Temp.Emer.Ct. App.1983) (*per curiam*). *See Citronelle-Mobile Gathering, Inc.,* 669 F.2d at 722 ("Actions by the United States under ESA § 209 are taken to enforce public, not private, rights.").

TECA has twice specifically rejected motions to intervene by private parties in § 209 actions on the ground that the public and private enforcement devices must not be commingled. *Exxon Corp.,* 773 F.2d at 1283; *Cities Services,* 715 F.2d at 574. The DOE enforcement action does not affect a private parties' right to recovery, and any restitutionary remedy ordered by a court to correct violations will not impair a legally cognizable interest. TECA's precedents demonstrate that private entities do not have the requisite interest in public enforcement actions brought under § 209 to intervene as of right.

The Carriers argue that either PODRA or the *Stripper Well* Agreement supply the necessary interest in the enforcement action to override *Exxon Corp.* and *Cities Services* and permit intervention as of right. Under PODRA, the Carriers assert Congress, by explicitly directing DOE to make restitution to "persons or classes of persons injured by any actual or alleged violations," 15 U.S.C. § 4502(b)(1)(A), has created in private parties the requisite interest under Rule 24(a)(2). The proposed intervenors do not argue for an implied cause of action under PODRA, but only that a legally cognizable interest arises from the statute.

The flaw in the Carriers argument is that PODRA is directed solely to DOE and any court or agency holding overcharge funds, formulating the basic policy that will guide future disbursements. PODRA cannot be read as conferring a cognizable interest on all private persons who assert they were injured by an overcharge in all present and future enforcement proceedings where a restitutionary fund will be formed. The remedy question the Court will consider is whether to affirm DOE's decision to apply the Subpart V regulations, including the MSRP guidelines, to the $180 Million Fund. A subsidiary issue will be whether the distribution program created by DOE for the fund, including the 20% reserve for private claimants, comports with the requirements

of PODRA. These questions are directly related to the public enforcement action, as part of the Court's power under § 209 of the ESA is to "order restitution of moneys received in violation of any such order or regulation." Until the Subpart V proceedings have been completed, the private parties do not have an interest in a restitutionary fund.

The Carriers' argue that if PODRA does not invest them with the requisite interest, then the *Stripper Well* Agreement does because DOE and the states have agreed to reserve 20% of all crude oil violation funds for private claimants. *Stripper Well* Agreement IV.B.1. The Carriers, however, fail to provide a cogent reason to support their bald assertion concerning the *Stripper Well* Agreement. They are not parties to the agreement, and would be precluded from participating in this case if they had signed it because of the mandatory waiver provisions.

In *Blue Chip Stamps v. Manor Drug Stores,* the Supreme Court stated that "a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975). In *Midwest Petroleum Co. v. Department of Energy,* TECA held that private parties could not intervene to enforce the terms of consent decrees entered into by the government in § 209 actions. 760 F.2d 287, 290 (Temp.Emer.Ct.App. 1985). The Carriers did not participate in the settlement embodies in the *Stripper Well* Agreement, and cannot now rely on that agreement to provide them with a legally cognizable interest. Moreover, the agreement between the federal government and the states, that DOE will recommend in other crude oil violations cases the procedures applied in *Stripper Well,* does not automatically create an interest in the fund for the Carriers. DOE's promise to recommend is still subject to the Court's acceptance of the program under the MSRP and PODRA, and therefore the Carriers cannot have an interest growing out of a *proposed* course of action.

The Carriers have not demonstrated that PODRA or the *Stripper Well* Agreement create a legally cognizable interest. *Cities Services* and *Exxon Corp.* establish that private parties may not intervene in government enforcement actions under § 209, and therefore the motion to intervene as of right will be denied.

**B. Permissive Intervention**

Federal Rule of Civil Procedure 24(b)(2) provides:

> Upon timely application anyone may be permitted to intervene in an action: (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

■ Assuming the proposed intervenor presents a common question of law or fact, the decision to permit intervention is within the Court's discretion. *Holland v. Sterling Enterprises, Inc.,* 777 F.2d 1288, 1293 (7th Cir.1985); *Pierson v. United States,* 71 F.R.D. 75, 81 (D.Del.1976); *see* C. Wright, A. Miller, & M. Kane, 7C *Federal Practice & Procedure* § 1913, at 376 (1986). The central consideration for the exercise of discretion is whether allowing intervention will cause "delay or prejudice."

The Carriers seek intervention to argue that the 20% reserve for private claimants under the *Stripper Well* Agreement and the MSRP *may* not adequately cover their potential claims. They assert any claims for regulatory violations should cover the entire amount of all overcharges they sustained and not just those directly attributable to the restitutionary procedure adopted in the *Stripper Well* Agreement, in which parties received their share of all present and future overcharge funds.

In light of their position, the Carriers argue they should be accorded the same status as the states, that of permissive intervenors. Once accorded party status, they can present their case, which clearly conflicts with the states and may be differ-

ent from DOE's. The states assert that, under OHA's and the Court's earlier findings that direct restitution is impracticable, the entire fund should be divided evenly between the public parties. DOE seeks to apply the MSRP guidelines by reserving 20% of the fund and conducting Subpart V proceedings. The essential conflict between the Carriers, states, and DOE concerns the proper division of the fund.

The conflict between DOE and the Carriers is more apparent than real. As noted by the counsel for one group of Carriers, the 20% reserve will most likely cover all private claims, and the total amount distributed to end-users will probably not exceed 15%. Statement of Philip B. Kalodner, Esq., Counsel for Consolidated Edison, et al., Transcript of Status Conference, Dkt. 220, at 91–92, 153. Moreover, the Carriers' position has not advanced to the point of directly claiming specific amounts because the individual claims have not yet been considered. At best, the Carriers' interest in the fund is too attenuated because their right to claim does not mean they will necessarily recover any of the restitutionary fund. On the other hand, the states' interest is direct, in that they are certain to receive a share of the fund, and the only issue for them is how much. Permitting intervention by the Carriers will not aid the Court's consideration of the remedial issue because their position is doubtful and predominantly represented by DOE.

This litigation is now over eleven years old, and one shudders at the thought of what its teenage years will be like. The Court's primary goal on the remedial question is to expeditiously distribute the fund. Intervention by the Carriers will not materially advance the process, and may well cause additional delays if they were to raise extraneous issues. The Court will deny the Carriers' motion for permissive intervention under Rule 24(b)(2).

### C. Amici Curiae

The Carriers request leave of the Court to file briefs on the remedial issue as *amici curiae*. The federal government and the states do not oppose their appearance in this capacity. The additional views of the carriers may aid the Court's review of DOE's decision, and therefore the motion will be granted.

### III. CONCLUSION

The motions to intervene by the Carriers under Rules 24(a)(2) and 24(b)(2) will be denied. The motion to appear as *amici curiae* will be granted.